LAMM ASSOCIATES, PLAINTIFF, v. BOROUGH OF WEST CALDWELL, DEFENDANT.

Tax Court of New Jersey

June 9, 1980.

*Lawrence S. Berger* for plaintiff.

*Podvey & Sachs* for defendant (*Robert L. Podvey* appearing).

HOPKINS, J. T. C.

This is an appeal from judgments of the Essex County Board of Tax Appeals as to the assessed value of property described as Block 81B, Lot 9, in West Caldwell.

The following schedule shows the original assessment, County Board Judgment and claimed assessment values of the parties:

| Year | Assessment | County Board | Taxpayer | Taxing District |
|------|-----------|--------------|----------|-----------------|
| 1975 | $687,200 | $611,600 | $523,000 | $650,000 |
| 1976 | $611,600 | $611,600 | $523,000 | $650,000 |
| 1977 | $611,600 | $549,000 | $523,000 | $650,000 |
| 1978 | $611,600 | $549,000 | $523,000 | $650,000 |

The issues presented to the Court are, what is the true value of this property as of the appropriate assessment dates and, further, in the event true value exceeds the original assessment for any year, whether said assessment can be adjusted upward.

The property involved is located on the north side of Patton Drive in the Essex–Passaic Industrial Park, located in the Borough of West Caldwell. It is rectangular in shape with 315 front feet on Patton Drive and a constant depth of 445 feet. The total land area is 140,175 square feet, equivalent to approximately 3.22 acres. The site is level and improved, with all public utilities, including municipal water and sewers, gas, electricity and telephone. There are sewer line easements along two of the boundary lines which do not adversely affect utilization of the site as they are within the set back requirements for construction. It is zoned for light manufacturing.

The property is improved with a modern one–story concrete block and steel industrial building, erected in 1973, and containing 35,350 square feet, of which approximately 3,640 square feet is air conditioned. It is full sprinklered and has a 20–foot clear span except for the air conditioned area, which has a low clearance with dead storage area above it. It is owner occupied, having been purchased for $580,750 on December 19, 1973.

The plaintiff introduced testimony through an expert witness in support of its position that the true value as of all assessment dates was $523,000. Said expert testified that he placed chief reliance on the Market Data Approach and the Income Approach in evaluating the property. The Market Data Approach compares the subject property with similar properties recently sold. After adjustments for differences in time, location and physical characteristics, a value, or range of values, is suggested for the subject property. In the Income Approach, the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.

Neither expert witness in this matter utilized the cost approach in valuing the subject property.

In the Market Data Approach, plaintiff's expert utilized four transactions. The first transaction was a sale of improved property at Four Fairfield Crescent in West Caldwell.

The sale property consisted of 3.53 acres and was improved by a single-story industrial building containing a total of 25,000 square feet, 10 percent being air conditioned offices. It was a converted airplane hangar. The sale took place in July, 1976, at a sale price of $13.40 per square foot of improved space.

The second transaction was a purchase at a sheriff's sale of property located at 15 Patton Drive which was one lot removed from the property under consideration. At this distress sale, the property was purchased at $14.20 per square foot.

The third transaction also involved the property located at 15 Patton Drive and took place on August 29, 1978. At that time the property sold for $18.10 per square foot. The building did not have any office space and had a land area approximately two-thirds of an acre less than the property being valued.

The fourth transaction was a sale of property located at 11 Patton Drive, immediately adjacent to the property under review. That property sold, on March 18, 1977, for $16.25 per square foot. The land area was approximately three–fourths of an acre less than the property being valued.

Plaintiff's expert, on the basis of an analysis of the aforesaid four transactions, arrived at a value of $14.50 per square foot for the subject property, or a total value of $522,000.

Plaintiff's expert also utilized the Income Approach by comparing net leases. As such, he analyzed five leases, together with three proposed offers to lease, in an attempt to determine the economic rent of the subject property. The actual leases were consummated during the period 1973 through August 1975 and showed a range from $1.70 per square foot in 1973 to $2.03 as of August 1975 with a lease at $2.15 per square foot consummated in April 1975.

The $1.70 per square foot lease was estimated after recognizing that the lease was a gross rental lease at $2.25 per square foot. This property did not have any office space, and its land area was approximately two–thirds of an acre less than the property under review.

The next lease was entered into in 1973, at a rate of $1.75 per square foot and was located on Fairfield Crescent. It was for a period of ten years. This property was not serviced by sewers, a fact which plaintiff's expert agreed would make it less desirable than a property with sewers.

The next lease, in point of time, was a lease in June 1974 of property located at 10 Patton Drive, across the street from the property under review. This lease ran for a period of 20 years and was at the rate of $1.75 per square foot. It was a much larger building on a smaller piece of land.

The last two leases utilized were entered into in 1975. In April 1975 a lease at $2.15 per square foot was consummated pursuant to an option. The expert did not know whether or not this was a new entry. The other lease, commencing August 15, 1975, was at $2.03 per square foot and was for a period of five years.

The plaintiff's expert's testimony reflected an increasing rental per square foot for the years under review. The offers to lease, which plaintiff's expert testified to, namely $1.60, $1.60 and $2.10, during the respective years 1975, 1976 and 1977, also show that trend. However, offers to lease are not consummated transactions and could well change, depending upon the actual lease term and conditions.

Plaintiff's expert computed his valuation on the Income Approach by arriving at an economic rent of $1.75 per square foot, which resulted in a computation of $63,000. From this he subtracted a 5 percent vacancy loss of $3,150 and arrived at a figure of $59,850. This figure was further reduced by estimated expenses of insurance, $1,000; repairs and maintenance at 5 percent, $3,150; and management at 3 percent, $1,795; or a total of $5,945. This resulted in a net income of $53,905, of which he deemed $12,282 as being applicable to the land having a value of $45,000 per acre, or $144,500. This left $41,623 as applicable to the building. This figure was capitalized at an 11 percent rate which was a combination of 8.5 percent as interest and 2.5 percent as depreciation. The depreciation was based on a 40 year life. Under this approach, plaintiff's expert arrived at a value of $522,900.

Plaintiff's final figure of $523,000 was arrived at by analyzing the Market Data Approach which gave him a figure of $522,000 and the Income Approach which gave him a figure of $522,900. The $523,000 figure was deemed applicable to all years before the Court, as the plaintiff's expert testified that property values were stable in this particular area during the periods involved.

Defendant's expert testified that the fair market value of the subject property for the years involved was $650,000. In reaching this conclusion, he utilized both the Income Approach and the Market Data Approach, which he has designated as the Comparative Approach.

In the Comparative Approach, he utilized nine sales in West Caldwell of somewhat similar industrial buildings and, in addition, utilized five other industrial transactions in the adjoining

community of Fairfield. The aforesaid nine sales included the sale of the subject property in December, 1973. In analyzing the sales, the defendant's appraiser utilized the price per square foot method.

The first sale analyzed was the sale of the subject property in December 1973, which he determined to have a value of $16.43 per square foot.

The second sale was that of a property located at 11 Patton Drive, which was immediately adjacent to the subject property. This was a new building erected in 1976 and sold in March 1977 at a price per square foot of $16.25. It had a ratio of office space to total space of 12 percent. This land area was approximately three–quarters of an acre smaller than the subject property. While the sale price reflected a sale at $16.25 per square foot, he testified that an adjustment for the land would indicate a price, for comparability purposes, of $17.00 per square foot.

The third sale was a property located at 15 Patton Drive which sold in August 1978. This had approximately three–quarters of an acre less land area than the subject property. These factors would, in his opinion, result in an adjusted square foot price of approximately $20.00 per square foot.

The fourth sale is Eight Henderson Drive. This property sold in August 1976 at a price per square foot of $24.90. However, there was land area of 14.99 acres. Because of the large land area, he was less inclined to rely upon this particular sale.

The fifth sale was One Fairfield Crescent in West Caldwell. It sold in May 1978 at $29.15 per square foot. Its ratio of office space to total space was 12.5 percent. However, it had a very close proximity to the former Caldwell Airport, and there were no sewers. The sale reflected a price of $29.15 per square foot.

The sixth sale was 600 Passaic Avenue, which sold in June 1978. Its ratio of office space to total space was 33.8 percent. However, the building was in very poor condition. This sale reflected a value of $24.95 per square foot.

The seventh sale was 43 Fairfield Place, in July 1978. Its ratio of office space to total area was 13.7 percent. However, it was fully air–conditioned, and the price per square foot was $30.15.

The eighth sale was 11 Fairfield Place, West Caldwell, which sold in January 1979. This was an older type building erected in 1957 and had an office space ratio of 18.1 percent. This sale reflected $35.37 per square foot.

The ninth sale was 620 Passaic Avenue in West Caldwell. This sale occurred in February 1979 at a price per square foot of $23.62. It had an office space ratio of 62.2 percent.

The tenth sale was 25 Law Drive in Fairfield, an adjacent community. This sale reflected a ratio of finished office space of 12.9 percent and computed at $20.34 per square foot on a relatively small 1.39 acre tract.

The eleventh sale was Seven Spielman Road in Fairfield, which sold on April 1, 1977 at a price per square foot of $22.85. Its ratio of office space to total space was 16 percent. The land area was less than one acre.

The twelfth sale was 24 Just Road in Fairfield. It had a ratio of 45.6 percent of office space, and the sale reflected a square foot price of $26.52. The property was on a land area of 1.4 acres.

The thirteenth sale was 28 Kulick Road in Fairfield. It occurred on May 11, 1978. The property was constructed in 1960, and the ratio of office space was 23 percent. There was no sprinkler system. The land area was less than one acre. The property sold at $29.30 per square foot.

The fourteenth and last sale analyzed was 12 Spielman Road in Fairfield. It sold on April 1, 1977. It was erected in 1968 on 1.01 acres, and had an office space ratio of 32.8 percent. The sale reflected a price per square foot of $21.59.

The defendant's expert selected six of the aforesaid properties as being most directly comparable, namely, 11 Patton Drive, 15 Patton Drive, One Fairfield Crescent, 43 Fairfield Place, 25 Law

Drive, and Seven Spielman Road. Of these six, he gave greater emphasis to the first three, as two were located on Patton Drive in the general area of the subject property.

In analyzing 11 Patton Drive property, he noted that it contained 43,400 square feet as compared to the subject property's 35,350. It had a 12 percent office space ratio, as compared to 10 percent for the subject property, and the lot area was 2.48 acres as opposed to 3.22 acres for the subject property. He believed that the subject property had a 10 percent superior value due to the larger sized lot. As he believed there was a 10 percent annual increase in values in the general area during the time frame involved, he utilized this 10 percent difference for each year and, accordingly, came up with a square foot value of $14.30 for 1975, $16.08 per square foot in 1976, $17.87 per square foot in 1977, and $19.66 per square foot in 1978. He then averaged it for four years to round off at $17.00 per square foot.

The next property which he analyzed in depth was 15 Patton Drive. After taking into consideration that the subject property had approximately three–quarters of an acre more than the sale property and, further, that there was no office space in the sale property, he found the subject property to be 20 percent superior. This resulted in a price per square foot for comparability purposes of $15.00 for 1975, $17.00 per square foot for 1976, $19.50 per square foot for 1977, and $21.50 per square foot for 1978. The four year average resulted in a value of $18.50 per square foot.

The third sale that he analyzed in depth was 43 Fairfield Place. This sale occurred in July 1978. The ratio of office space to total space was 13.7 percent, and the lot size was 2.35 acres, as opposed to 3.22 for the subject property. He considered the subject property to be superior in location because of the proximity of the sale property to the Caldwell Airport and the depreciating factor of plane noise. However, he considered the subject property, as a whole, to be substantially inferior, as 43 Fairfield Place was totally air–conditioned. However, there would be an adjustment for acreage, as the subject property had

almost an acre more than the sale property. After considering all these elements, he considered the subject property to be only 75 percent as good as the sale property. Accordingly, taking into consideration the time, location and physical characteristics, he considered the comparable price per square foot applicable to the subject property of $16.58 for 1975, $18.99 for 1976, $19.00 for 1977, and $21.50 for 1978. This resulted in an average for the four years of $20.00.

He then averaged the averages for the three critical sales and came up with an overall average for the four years of approximately $20.00 per square foot. Applying this to the subject property, he came up with a value of slightly over $700,000. He then selected a value of $18.50 per square foot as a value for the four years and arrived at a value of $650,000 for the subject property.

Defendant's appraiser also utilized the Income Approach in valuing the subject property. In so doing, he used seven industrial rentals in the general area of the subject property. All were net leases, four of which had also been utilized by the plaintiff's expert.

The first comparable was 20 Audrey Place in Fairfield, leased from May 1975 to April 1985 at $2.13 per square foot; Number 2 was 15 Fairfield Crescent in West Caldwell, leased from November 1973 to October 1993 at $2.18 per square foot; Number 3 was 10 Patton Drive, West Caldwell, leased from September 1974 to August 1994 for $1.75 per square foot; Number 4 was 18 Passaic Avenue in Fairfield, a two-year lease commencing April 15, 1975, at $2.15 per square foot; Number 5 was 291 Fairfield Avenue in Fairfield, from August 15, 1975 to August 15, 1980, at $2.03 per square foot; Number 6 was Seven Fairfield Crescent in West Caldwell, which commenced in July 1973 to July 1983 at $1.75 per square foot; and Number 7 was 37 Fairfield Place, which commenced on February 1, 1977 to January 31, 1984, at $3.59 per square foot.

He eliminated lease Number 3 as being too large for comparison, as it contained 167,600 square feet. He believed that lease

Number 6, which was consummated in July 1973, was too old for comparison. He believed that lease Number 7 was too recent to have any probative value for the years starting with 1975.

The leases that he did consider fell into a rather narrow range of $2.03 per square foot to $2.18 per square foot, and he utilized $2.00 a square foot on a net basis as a fair rent. This gave him an economic rent of $70,700, which he rounded off to $71,000 per year. After allowance of the vacancy factor of 5 percent, he also allowed those expenses which he believed that an owner would incur if the property was rented on a net lease basis.

He allowed administrative expenses of $600 a year; a reserve for structural repairs of $750 a year; and miscellaneous of $250 a year. These amounts total $1,600, which he deducted from the effective gross annual income, giving rise to net income applicable to the property of $65,850. He capitalized the $65,850 figure at 10.016 percent, which percentage was arrived at by assuming that two–thirds of the cost of the property would be financed through a mortgage at 9.5 percent for 15 years. He assumed that the equity position in the property would earn 11 percent and that the property owner would hold the property for approximately ten years or until the benefits of depreciation started to wear away. By so capitalizing, he came up with a figure of $657,500 which he rounded out to $650,000. In his capitalization computation he utilized a land value of approximately $50,000 an acre. In support for that land value, he referred to five land sales in West Caldwell commencing January 21, 1975 through February 6, 1979, wherein acreage sold at from $52,210 an acre to $82,477 per acre.

Both appraisers, in reaching their respective conclusions, used both the Market Data Approach and the Income Approach. In both instances, the conclusions reached under one approach dovetailed with the other. The plaintiff's appraiser stated that the values in the area of the subject property were static during the taxable years involved, while the defendant's appraiser testified that values were increasing at approximately 10 percent a year.

Plaintiff's appraiser, on the basis that values were static during the years involved, utilized four transactions in concluding a value under the Market Data Approach. I find that the first transaction, which was a sale in 1976 of a converted airplane hangar located in an area which had no sewers, to be of very limited weight. Further, the second transaction, which was a purchase by a mortgagee at a mortgage foreclosure, was obviously not an arms–length transaction but rather a distress disposition. The third transaction, a sale in August of 1978, which was ten months subsequent to the latest assessment date, of property one lot removed from the subject property, must be looked at in the light that it lacked air conditioned office space and had a land area of approximately two–thirds of an acre less than the subject property. With respect to the fourth transaction, this was most comparable with the subject property, even though it, too, had approximately two–thirds of an acre less land area. Even with those disadvantages, the last two properties sold at $18.00 per square foot and $16.25 per square foot, respectively, and contravene the plaintiff's expert's conclusion that the subject property should be valued at $14.50 per square foot. If, in fact, prices in this immediate area had remained stable during the full period involved, then the latter two transactions would more clearly reflect that stabilized price structure rather than the reduced amounts concluded by plaintiff's expert.

In the Market Data Approach utilized by defendant's expert, he testified that there was an approximate annual increase of 10 percent applicable to each of the years involved. This 10 percent differentiation was utilized by him on a descending scale when the sale took place subsequent to the critical assessment dates. The more desirable approach is to conclude a value based on facts known or reasonably foreseeable as of the assessment date with subsequent events deemed relevant only if they are corroborative or consistent with the reasoning and approach utilized. See *In re Erie Railroad System*, 19 *N.J.* 110, 130, 115 *A.*2d 89 (1955); *New Brunswick v. State of N. J. Div. of Tax Appeals*, 39 *N.J.* 537, 545, 189 *A.*2d 702 (1963); and *Park-*

*view Village Assoc. v. Boro. of Collingswood,* 62 *N.J.* 21, 29, 297 *A.*2d 842 (1972). Further, I have difficulty with the computational process followed by the defendant's appraisal expert in averaging a common value for each of the three principal comparables utilized and then averaging those averaged values to come up with an average value for the four years involved. Such averaged value is directly contrary to his testimony that there was an average increase in value of approximately 10 percent per year which, if such was so, would require different values as of each of the specific assessment dates. See *N.J.S.A.* 54:4–23.

In coming to a value under the Income Approach, plaintiff's appraisal expert utilized five leases and three proposals to lease of which he was aware. The five leases ranged from $1.70 per square foot in 1973 to $2.03 in August of 1975. The offers to lease range from $1.60 in 1975, $1.60 in 1976, and $2.10 in 1977. The leases in 1975 at $2.03 and $2.15 a square foot were in the adjoining community of Fairfield. The tax rate in Fairfield approximated $1.00 less per $100 of assessed valuation than in West Caldwell. Fairfield's ratio of assessed values to true values was slightly higher than West Caldwell's ratio. Accordingly, the different tax rates would have to be taken into consideration when determining the actual rental being paid by a tenant and, as such, would be reflected in the rent per square foot under a net lease. The Fairfield net leases would require a downward adjustment to properly compare them with West Caldwell leases.

In the computation under the Income Approach, plaintiff's appraisal expert, on the premise that the values in this immediate area remained stable during the periods under review, concluded one value as applicable to each of the years. This value was computed on the basis of a rental per square foot of $1.75.

The appraiser's own comparables belie that conclusion. Indeed, they show a gradually increasing rental per square foot during the period under review and, while they may not reflect

an annual increase of approximately 10 percent, they certainly were not stable.

It should be noted that plaintiff's appraisal expert relied quite heavily upon the fact that property located at 15 Patton Drive, one lot removed from the subject property, remained vacant at the end of its lease in 1976 until it was sold on August 29, 1978. This property, when sold, was sold at a price of $18.00 per square foot, despite the fact that it was inferior to the subject property in both the land size and lack of air–conditioned office space. His statement that the price per square foot reflected a favorable mortgage given by Prudential is questionable, as 80 percent financing of a commercial industrial building of this type is not that unusual. Further, it would appear that the Prudential mortgage at 10.5 percent was a very beneficial rate insofar as the mortgagee was concerned.

The defendant's appraisal expert, also utilizing the Income Approach, utilized a number of the same comparable net leases. However, he primarily relied upon four of the seven leases. The rent per square foot of these four fell within the range of $2.03 to $2.18. He therefore selected an economic rent of $2.00 per square foot on a net basis as a fair rental for the years involved. Of these four leases, two were for properties located in Fairfield, and he failed to make an adjustment to reflect the variation in tax rates between the communities. It should be noted that one of the leases which he disregarded as being too recent was actually entered into in January of 1977, which was prior to the assessment date of October 1, 1977. This lease was at the rate of $3.59 per square foot.

The record, as a whole, clearly indicates that the subject property was appreciating in value through the taxable periods here involved. Accordingly, it will be necessary to utilize that information made available by the parties and to arrive at valuations as of the critical assessment dates. This Court has not only the right, but the duty, to apply its own judgment to valuation data submitted to it by experts in order to arrive at a true value and fix an assessment for the tax years in question.

See *Samuel Hird and Sons, Inc. v. Garfield*, 87 *N.J.Super.* 65, 208 *A.2d* 153 (App.Div.1965).

I find that, after taking into consideration all comparables utilized by both expert witnesses and a recognition of the fact that the valuation is most reliable when made as of a critical date predicated upon information known or reasonably anticipated as of that date, that any comparables between the communities of Fairfield and West Caldwell must reflect the difference in tax rates and assessment ratios; that the subject property should properly be valued as investment property; and that such valuation should be tested by resort to the Market Data Approach. See, *New Brunswick v. State of N.J. Div. of Tax Appeals, supra.* Accordingly, I find that the net rent per square foot of the subject property as of the critical assessment dates to be as follows:

October 1, 1974–$1.80
October 1, 1975–$1.80
October 1, 1976–$1.85
October 1, 1977–$2.00

In reaching the above rents per square foot, I have given great weight to the lease of 10 Patton Drive, across from the subject property, in September of 1974 at $1.75 per square foot. However, that property had approximately three–quarters of an acre less land than the subject property, which I find would result in a higher rental for the subject property. Subsequent leases, as testified by the two experts, showed increased rentals during the period under review. Indeed, the lease in February 1977 of the property located at 37 Fairfield Place, even adjusted to make it comparable at only 75 percent, as testified to by defendant's expert, would show a comparative rental per square foot of $2.69. However, I feel that this shows a drastic increase and is not reflective of the overall trend to that extent. Accordingly, the rental per square foot, as of the subsequent assessment date of October 1, 1977, has been limited to a rental of $2.00 per square foot.

Utilizing the aforesaid rents per square foot, I accept the vacancy factor of 5 percent as utilized by both appraisal experts.

■ With respect to the expenses claimed, plaintiff's expert utilized an annual deduction of $1,000 for insurance. Defendant's expert did not utilize any insurance expense, as he testified it was the common practice to have the tenant, under a net lease, bear the cost of insurance. I find that insurance is normally carried by the tenant and not a proper expense in determining a value on an economic income approach based on a net lease. A "net lease" is generally defined as one under which the tenant will be responsible for all expenses usually associated with the maintenance of a building, including repairs, taxes, utility charges, and insurance, and to keep the premises in good condition, excluding, however, reasonable wear and tear. See *Frank Lyon Co. v. United States*, 435 *U.S.* 561, 98 *S.Ct.* 1291, 55 *L.Ed.2d* 550 (1978). Accordingly, in attempting to value the subject property under the income approach, no deduction for insurance will be allowed.

■ Plaintiff's expert further deducted the sum of $3,150, or 5 percent of the effective gross income, as a reserve for repairs and maintenance. He further explained this was a reserve primarily for repair or replacement of the roof, which he estimated to have a typical life of 15 years. The roof with which he was concerned had a concrete deck with an undersupporting ribbon steel deck and a covering of tar with stone or gravel. He believed that it would be necessary to build up a fund to replace this roof at the end of the 15 year period. To the contrary, defendant's expert believed that all that would be necessary with respect to the roof was occasional patching and that a properly installed roof had a lifetime in excess of 20 years. Further, defendant's expert believed that a sum of $750, if deposited annually for 20 years at 6 percent interest, would have grossed $27,589, if left undisturbed, and that this would be an adequate reserve to fund any replacement problems with the roof. I find the plaintiff's expert's estimate is unduly high and that a reserve approximating 2 percent of effective gross income would be adequate to provide a reserve for all such structural repairs or repairs which the owner would have to undertake under the terms of a net lease.

 Plaintiff's expert also utilized a management fee of 3 percent of effective gross income as necessary in order to compute the property value under the Income Approach. Defendant's expert utilized a sum of $600 for administrative work and stated that this was another term for management. He pointed out that this was a single–tenant building and there would be very few management problems. I find that the sum of 1 percent of effective gross income is an adequate expense deduction covering administrative, management and miscellaneous items in a single–tenant building such as the one being discussed.

Accordingly, expenses would be 3 percent of effective gross income for all years involved.

In capitalizing the net income to the property, the plaintiff's expert first computed a return to the land which he valued at $45,000 per acre. After subtracting this from the net income, he arrived at a net annual return to the building. The net annual return to the building was capitalized at 11 percent which was composed of interest at 8.5 percent and depreciation of 2.5 percent. When the net to the building and the net to the land were added together, to arrive at his value of $522,900.

Defendant's expert took a different approach to the valuation of the subject property. He did not compute a return to the land but, rather, arrived at a total valuation assuming the availability of a mortgage for two–thirds of the cost of the property at a 9.5 percent rate for a period of 15 years, assumed an 11 percent return on the equity position and then assumed a 10 year holding period with the owner selling at the end of that time, as the depreciation benefits would have been exhausted. His capitalization rate for the effective net income to the property was 10.016 percent, with a consequent value of $657,-500. He then separately valued the land at $50,000 an acre and arrived at a land value of $161,000. The balance, i. e., $496,500, was attributed to the value of the building.

 I have concluded that the most appropriate method to be utilized in coming to a value was that which was followed by the

plaintiff's expert, namely, a determination of a value to the land with an appropriate return, and an appropriate return of the corresponding net to the building with a depreciation factor included. The capitalization factor of 8.5 percent to the land and the capitalization rate of 11 percent to the property, which included a 2.5 percent depreciation factor, will be utilized in computing the value. However, said computation will be adjusted to show a land value as of October 1, 1974 through October 1, 1977, of $50,000 an acre rather than the $45,000 per acre as followed by the plaintiff's expert. Defendant's expert utilized a $50,000 per acre value and testified in support of that figure. Further, his report shows three sales of industrial land during the years involved which ranged between $52,210 per acre and $64,145 per acre.

Accordingly, in the computation under the net income approach, the land will be valued at $50,000 an acre.

Utilizing the aforesaid rents per square foot, vacancy rate, expense rates, land values and capitalization rate, the property, under the Income Approach, would have values as follows:

| | Total Value | Value Per Square Foot |
|---|---|---|
| October 1974 | $569,000 | $16.10 |
| October 1975 | $569,000 | $16.10 |
| October 1976 | $583,500 | $16.51 |
| October 1977 | $628,000 | $17.77 |

In testing the Income Approach values against the comparative sales, I find that the subject property sold for $16.43 per square foot in December of 1973 and that a property at 11 Patton Drive, one lot away from the subject property, which involved a larger building on a smaller lot, sold at $16.25 per square foot in March 1977. This latter lot, as testified by defendant's expert, after a 10 percent adjustment, would bring the price to $17.88 per square foot, which compares favorably with $17.77 per square foot as of October 1, 1977, if the aforesaid Income Approach values are used.

Accordingly, I find that the values computed under the Income Approach constitute the true values for the years involved.

As the true value found for the taxable year 1978 exceeds the assessed value by $16,400, the issue remains as to whether such finding by this Court can increase the original assessment where the taxing district did not appeal such assessment to the County Board.

Defendant, in support of the position that such increase can be effected, relies on the proposition that the notice requirement, as enunciated in the case of *Borough of Matawan v. Tree Haven Apartments, Inc.,* 108 *N.J.Super.* 111, 260 *A.2d* 235 (App.Div. 1969), was satisfied by the appeals taken from the County Board judgments to the then Division of Taxation.

An original assessment is prepared by an assessor pursuant to *N.J.S.A.* 54:4–35, but does not become the assessment until after the completion of the entire assessment list and submission of it to the County Tax Board for examination, revision and correction by it. *N.J.S.A.* 54:4–46. When the County Tax Board has completed its review and revision, the tax duplicate, as revised and corrected, is returned to the taxing district's collector and the assessment is complete. *N.J.S.A.* 54:4–55. If, at that time, the taxing district is dissatisfied with that assessment, it has the right to appeal to the County Board pursuant to *N.J.S.A.* 54:3–21. Notice of such appeal must be given to the taxpayer. See *Jersey City v. Division of Tax Appeals,* 5 *N.J.Super.* 375, 69 *A.2d* 331 (App.Div.1949) *aff'd* 5 *N.J.* 433, 75 *A.2d* 865 (1950).

Absent a timely appeal, with appropriate notice to the taxpayer, the County Board does not have jurisdiction to increase an assessment once the assessment process has been completed by the return of the duplicate assessment list to the tax collector. It was an appeal at the County Board level which required the "notice" discussed in *Tree Haven, supra.* That cannot be satisfied, as requested by the defendant, by a "notice" at the Division of Taxation level, supposedly implied by appeals from assessments involving different tax years. Each annual

assessment is a separate entity, distinct from the assessment of prior or subsequent years. *Borough of Hasbrouck Heights v. Div. of Tax Appeals*, 54 *N.J.Super.* 242, 248, 148 *A.2d* 643 (App.Div.1959); *In re Appeal of East Orange*, 103 *N.J.Super.* 109, 113, 246 *A.2d* 722 (App.Div.1968).

Accordingly, there is nothing in the facts in this case which would warrant any different result than that reached in *Tree Haven, supra.*

The judgment to be entered with respect to the taxable year 1978 will be in the amount of the original assessment.

Judgment will be entered in accordance herewith.