HOPKINS, J. T. C.
This case involves appeals from Union County Board of Taxation judgments affirming the assessments of industrial property designated as Block 192-A, Lot 24 — 46, in the taxing district of Roselle. Those assessments were as follows:
1977 1978
Land $115,000 $ 287,500
Improvements 413,000 868,500
Total $528,000 $1,156,000
Plaintiff’s position is that the subject property should properly be valued under the capitalization of income approach and that it should be considered as one economic unit with two nearby lots, having a total area of 30,000 square feet, since those lots, used for parking, were necessary for the operation of the subject industrial building. Further, in pursuing that approach the value should be the same for both tax years, namely $825,000 inclusive of the value of the parking lots. Accordingly, plaintiff asserts that the assessed value for 1977, after applying a stipulated common level of assessment, should be $421,600 less the assessment applicable to the lots of $31,200, or $390,400. With respect to 1978, it is asserted that the appropriate assessment should be $825,000 less the $90,000 assessment attributable to the parking lots, or $735,000.
Defendant’s position is that the appropriate assessment for each of the years should be predicated upon the cost approach to value, as corroborated by an income and market approach. Accordingly, for the tax year 1977, defendant’s position is that the true value of the subject property was $850,000 without deducting any value attributable to the parking lots and application of the common level of assessment. For the taxable year 1978, defendant’s expert, in the same manner, placed a total value of $1,035,000 on the property.
The parties have stipulated that the ratio promulgated by the Director of the Division of Taxation applicable to Roselle repre *348 sents the common level of assessment in that taxing district for 1977. A revaluation was implemented for 1978.
The subject property, which is occupied by a subsidiary of the owner, consists of the land and industrial plant, used together with two noncontiguous parking lots, located at 711 East First Avenue. It lies on the northerly side of East First Avenue, just west of the Elizabeth line where East First Avenue becomes West Grand Avenue. It is on the southerly side of the tracks of the former Central Railroad of New Jersey and just southeast of the Roselle Park boundary. The two parking lots, used with the main parcel, are across East First Avenue, one at the corner of Hawthorne Street and one at Hamilton Street. The lot is regular in shape with frontage of 575 feet and a depth of 200 feet, for a total area of approximately 115,000 square feet.
The lot is generally level and follows the grade of East First Avenue. The site is improved with a one-story brick and masonry industrial building. There is a water tower, presently not used, located at the northeasterly corner of the site. For all intents and purposes, the subject property is owner-occupied.
The parcel to the east of the subject is occupied by a large bowling alley, and then there are industrial users ending with the Purepac complex at North Avenue, Elizabeth. To the west are, generally, industrial or service businesses varying in size. To the south, on the opposite side of East First Avenue, are dwellings, and to the north, across the railroad in Elizabeth and Roselle Park, are residential and industrial/commercial properties.
The property is improved with a 25 to 50-year-old, one-story sprinklered industrial plant with an extension constructed in 1976. It has a gross area of 96,270 square feet, plus two small enclosed loading platforms, one roofed and one partially roofed. The main area of 81,270 square feet has brick and/or concrete block walls, concrete floors, wood frames, wood roof deck with 57,040 square feet of sawtooth roofing and 24,230 square feet of flat roofing; steel sash partially blocked up, and wall-hung, factory type radiators and blowers in the plant. Ceiling height *349 is 12'6" to the beams in the sawtooth area and 14'8" in the flat section, both lowered 2' by pipes and further by electric fixtures. Bays are 20' X 25' and 20' X 20'. There are 3,000 square feet of concrete-floored mezzanine for lavatories, locker rooms and dining area, with concrete or tile block walls. The new extension of 15,000 square feet has insulated metal walls and roof deck, steel frame and 16' to 20' height, with 70' of clear span. Heating is provided by an oil-fired Cleaver Brooks boiler and two free-standing Dravo units. There are 5,000 square feet of air-conditioned offices with hung ceilings; sheet rock covered walls, generally paper-covered with limited areas of prefinished panelling; fluorescent lights and carpeted floors. The office section has three lavatories, and the plant has two other facilities in addition to those on the mezzanine. An 8,840 square foot area provides tailgate and indoor loading. General condition of the 81,270-square-foot area is fair, with the condition of the floors in that area being fair to poor. A 15,000-square-foot section is in “new” condition.
Plaintiff’s expert, in explaining his approach to valuing the subject property, recognized the three accepted approaches, namely, the income approach to value, the market approach and the reproduction cost. With respect to the latter approach, he testified that the functional and economic obsolescence factor in such approach is revealed when the income or market value estimates are less than the depreciated replacement cost approach. He thus concluded that the cost approach does not represent an independent indication of value. See also, 1 Real Property Appraisal Manual for New Jersey Assessors, 3 ed., V. 109.
With respect to the income approach, he concluded that the property could be leased for $1.40 a square foot, with the landlord to 'jiay base-year real estate taxes, fire insurance, structural repairs and his costs. Further, a reserve of 5% for vacancy and credit loss would be appropriate inasmuch as he determined that the real estate market during the period October 1, 1976 to October 1, 1977 was fairly stable, he felt no material change would have occurred in rental values between *350 those two dates. While interest rates were dipping slightly, the influence on value would be difficult to isolate and would not be discernible in the marketplace. Accordingly, he estimated an economic rent of $135,000, together with $500 for lease of the parking lot at nights to the adjacent bowling alley, or a total of $135,500. From this he subtracted a reserve for vacancy and credit loss of 5%, or $6,500, to give an effective gross income of $129,000. His expenses were 5%, or $6,500, for management; $4,800 for structural repairs and reserves, and $3,800 for fire insurance, or a total of $15,100, giving a net before interest, recapture or real estate taxes of $114,900. This he capitalized at a 9% interest rate and an effective tax rate of 3.18%. His land value was $377,500, or $2.80 a square foot. His recapture rate, under the building residual approach, was 3.33%, representing a 30-year remaining effective life. This resulted in an estimated value of land and improvements, including the parking lots, of $820,000. He also used an overall capitalization approach, known as the band of investment, where he assumed that if the property were free and clear, the purchase capital would most probably come from a mortgage for the maximum amount obtainable at the best terms and an equity investment demanding a rate commensurate with alternative investment opportunities. He therefore assumed a 75% mortgage at 9.5% interest, 20-year payout (.75 X 11.196 constant), or 8.40 factor. To this he added the factor of 2.75 resulting from a 25% equity at an expected rate of return of 11%. The total capitalization rate, under the band of investment method, was 11.15% which, when added to the effective tax rate of 3.18% and applied to the $114,900 net income figure, resulted in a value to land and improvements of $801,814, rounded to $800,000. He used the same income approach for the tax year 1978, with the exception of the change in effective tax rate, to arrive at a value under the building residual approach of $830,000 and, under the band of investment approach, of $815,000.
Plaintiff’s expert testified that he also utilized the market data approach to test the income approach in comparing two properties. One of these properties, located in Hillside, New *351 Jersey, had 138,000 square feet of building area and sold at $7.46 a square foot in two transactions, one on July 31, 1978, and the other on August 18, 1978. The other comparable was a 142,300-square-foot industrial building located in Cranford, New Jersey, on the same street as the subject property and which continued into Cranford, sold on April 18, 1977 for $10.89 a square foot. He believed these comparables to be superior buildings in age, height and condition, as well as having a slightly better land-to-building ratio. Since his income approach values in the range of $800,000 to $830,000, or $8.31 to $8.62 a square foot of building area, were deemed consistent with the market data approach, it was his opinion that the final estimate applicable to both years would be $825,000 less the taxable values attributable to the parking lots.
Defendant’s expert relied primarily on the cost approach, which he attempted to corroborate by the capitalization of income approach. Further, he also attempted corroboration by the market approach to value. In his cost approach, he analyzed the various physical features of the improvement and utilized those cost conversion factors contained in the Real Property Appraisal Manual for New Jersey Assessors. The building was considered to have depreciated by 38.5% as of October 1, 1976, and by 48% as of October 1, 1977.
Defendant’s expert arrived at a land value by analyzing six sales which occurred between August 12, 1974 and September 25, 1978. He recognized that the September 25, 1978 land sale was nearly one year subsequent to the latest critical date here involved. Those sales, which were prior to the subject critical dates, ranged from $1.27 a square foot on a sale on Cox Street in Roselle on November 25,1974, to a sale on Cox Street in Roselle on December 15, 1975 at $1.89 a square foot. The sale on September 25, 1978, at $2.40 a square foot, was on East First Avenue, the same street as the subject property. However, it involved only 15,000 square feet. Defendant’s expert’s appraisal report considered the land value as of October 1, 1976, without including the parking lots, as equal to $2 a square foot, or $230,000, and, as of October 1, 1977, $2.40 a square foot, or *352 $287,500. In testifying, however, he indicated that the subject property could well be overbuilt and that the two parking lots should be considered in arriving at values predicated on the income approach.
Defendant’s values, under the cost approach, amounted to $869,800 and $1,034,567 for the respective tax years 1977 and 1978.
Defendant’s expert did compute a value under the income approach. In so doing, he utilized an economic rent of $1.50 a square foot for 1977 and $1.80 a square foot for 1978. He did not include any income from the lease of the parking lots. However, he utilized the same 5% rent and loss ratio as testified to by plaintiff’s expert, and his percentage of expenses amounted to 15% of effective gross income as compared with plaintiff’s expenses which approximated 11.75% of effective gross income. His capitalization rate differed only in the recapture rate and modest differences in the computation of the effective tax rate. He used a recapture rate of 2% as distinguished from the 3.33% utilized by plaintiff’s expert. As a result, his values under the income capitalization approach were $844,300 and $1,020,407 for the respective years 1977 and 1978.
In analyzing the position of the respective experts, it should be realized that properties of this type are normally bought and sold as investments and, as investment properties, are valued on the basis of income producing quality. As such, the cost value approach should not be the primary method of valuation. This court also agrees that in using the cost approach in this case, an expert’s opinion of economic or functional obsolescence is only revealed when compared with the market or income approach. Real Property Appraisal Manual for New Jersey Assessors, 109. It is therefore concluded that the appropriate valuation approach should be predicated upon the capitalization of income tested, where and if possible, by the market approach. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963).
*353 While plaintiff’s expert has combined his analysis into one value for each of the two taxable years, defendant has testified to separate values. It is recognized that a single value for more than one year may add to the stability of assessments. Switz v. Middletown Tp., 23 N.J. 580, 130 A.2d 15 (1957). Here, however, there was a revaluation effective in 1978. This factor, together with the recognition that each annual assessment is a separate entity, distinct from the assessment of prior or subsequent years, favors an approach that would have the years treated separately. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 103, 89 A.2d 385 (1952); Lamm Associates v. West Caldwell, 1 N.J.Tax 373, 392-3 (Tax Ct.1980).
The basic differences between the parties in their income approach are economic rent, estimated expenses, land values, capitalization rates and impact on value of the two required parking lots not here involved.
This court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965).
In concluding an economic rent of $1.40 a square foot for the years involved, plaintiff’s expert relied on seven leases involving five properties located in Hillside, New Jersey, and two properties in Elizabeth, New Jersey. The Hillside leases involved portions of a single industrial complex owned by Lionel Toy Corporation. A number of the leases required the landlord to furnish heat. I find that while they all involved comparable space, the municipality in which they were located, as well as the consolidated area to which all leases were applicable, were sufficient to avoid too great a reliance on them. The Elizabeth properties, while more in keeping with the location of the subject property, did involve a tax rate which was in the area of 18% higher than the effective tax rate of the defendant. Those two comparable leases, executed in 1977, called for average rents of $1.26 and $1.43 a square foot, with the landlord paying base-year taxes, fire insurance and structural repairs.
*354 Defendant testified to five comparable leases, three of which involved property in Roselle of less than 4,000 square feet. Those leases, executed in 1974, called for rents ranging from $2.10 to $2.50 a square foot. However, the $2.50 square-foot rental required the owner to supply water. The additional leases involved a property composed of 39,615 feet located in Union, at $1.57 a square foot, which lease was extended in 1975, and a property located in Kenilworth with an area of 16,519 square feet, which called for $2.42 a square foot pursuant to a lease entered into on September 24, 1970.
An analysis of all the leases submitted, placing greatest emphasis on those leases entered into shortly before the assessment dates and involving properties located in areas most closely akin to the Roselle location, leads to a conclusion that the economic rent would be $1.40 a square foot as of the assessment dates for both tax years.
Since the above economic rent is that to which the plaintiff’s expert testified, it is appropriate to accept his opinion as to a 5% vacancy and loss rate and expenses approximating 11.7% of effective gross income.
In concluding a land value, plaintiff’s expert utilized a value of $2.40 a square foot for each year without supporting said opinion by comparable transactions. Defendant’s expert testified to six transactions, all in Roselle, in reaching his value of $2 a square foot as of October 1,1976, and $2.40 a square foot as of October 1, 1977. Five of these transactions occurred during the period 1974 through December 15, 1975, with the sixth one, at $2.40 a square foot, on September 25, 1978. The 1978 transaction cannot be used as direct evidence of value. See Lamm Associates v. West Caldwell, supra. The remaining comparable transactions support a finding that a land value of $2 a square foot remained the same for each of the tax years here involved.
In reviewing the testimony with respect to the appropriate recapture rate to be utilized, it is recognized that, while the building is presently in need of cosmetic maintenance, it was improved in 1976 with a 15,000 square-foot-addition, and that *355 there is no indication of economic or functional obsolescence. While the building is 25 to 50 years old, it is still in sound condition. Accordingly, the recapture rate should be predicated upon a 40-year life expectancy, or at 2.5%. Since both sides have accepted a 9% interest return, the court also accepts that figure.
As the true values previously stated included the values of the parking lots not here at issue, it is appropriate that those values be excluded. As they totalled 30,000 square feet, the value for 1977 would be on the basis of $2.00 a square foot, or $60,000, and the value for 1978, at $2.20 a square foot, would be $66,000.
Utilizing the aforesaid adjustments, the value predicated upon the capitalization of income approach for the years 1977 and 1978 is $772,084 and $847,829, respectively.
The above computation was under the building residual approach. I have not accepted the band of investment approach offered by plaintiff’s expert, even though I find it particularly attractive, as there was no basis for a finding that an investor would require an 11% return on equity. In New Brunswick v. Tax Appeals Div., supra, in discussing an appropriate rate of return, it was stated:
A court cannot assume the correct answer will be had merely by adding some factor to what would be charged for a well secured loan, for while it is true that there is little risk in such a loan, it is equally true that there is no hedge against a shrinking dollar or opportunity for gain in a rising market. Moreover, the owner obtains a deduction for depreciation on his income tax return which the mortgage lender does not, and hence the apparent return is increased in real value. In any event, it is not for the trier of facts to decide abstractly what return an investor should want; the inquiry relates to what investors in property of this kind in fact do demand and do obtain in deals with willing sellers. [39 N.J. at 551, 189 A.2d 702]
The marketplace is the source of the required rate of return and until an appropriate analysis is made of appropriate marketplace transactions, the expert’s estimate has no foundation.
Further, as stated in New Brunswick, the value arrived at by an income capitalization approach should be tested by resort to the market approach. In this respect, plaintiff’s two comparable sales show a relationship to the value. Defendant’s compa *356 rabie sale occurred more than one year after the latest assessment date and with a mortgage as the total consideration. Accordingly, it is not deemed relevant as direct evidence.
On the basis of the above, the taxable value of the subject property, as of the critical assessment dates, after deducting values attributable to the parking lots, and applying the agreed upon ratio for 1977, are as follows:
1977 1978
Land $280,000 $253,000
Improvements 164,500 529,000
Total $394,500 $782,000
A judgment will be entered in accordance with the above.