ANDRESINI, J.T.C.
This is the court’s opinion after trial in the above-referenced matter. Plaintiff, TD Bank, N.A. (the “Plaintiff’ or “Taxpayer”), challenged the assessments imposed by Defendant, City of Hack-ensack (the “Defendant” or “City”), on the above-captioned properties for the referenced tax years. For the reasons stated more fully below, the assessment for each year is reduced.
I. Procedural History and Findings of Fact
This local property tax appeal concerns real property located at 111 River Street and 108-110 Moore Street in the City of Hacken-sack, designated as Block 204.01, Lot 16 and Block 204.01 Lot 26.01 respectively (the “subject property”), by the taxing district. The total assessment against the lots for each tax year challenged (2009, 2010 and 2011) is $3,568,500. The Chapter 123 ratio for each tax year is as follows: 94.20% for 2009 and 99.16% for 2010. There was a municipal-wide revaluation of all assessments for the 2011 tax year; therefore, Chapter 123 does not apply.
For the 2009, 2010, and 2011 tax years, the subject property (Block 204.01, Lots 16 and 26.01) was assessed as follows:
[[Image here]]
*373 [[Image here]]
[[Image here]]
The Chapter 123 Corridor was as follows:
[[Image here]]
The subject property is an irregularly-shaped, rectangular lot situated on the northwestern corner of the intersection of River Street and East Atlantic Street in Hackensack. It has a frontage of 211 feet along River Street, 160 feet along East Atlantic Street, 202 feet along Moore Street, and 166 feet along the northerly boundary of the property.[2] The land on which the improvement sits was acquired under a deed executed in 2004 for a purchase price of $2,300,000.[3] The total lot size is 38,332 square feet.[4] The *374 site is improved with all available public and private utilities including electric, water, sewer, and telephone. The property is located in the B2 business district zone, which permitted uses include retail stores and shops, art galleries, banks, drug stores, and multifamily dwellings. It is also situated within Designated Flood Hazard Zone AE.
The subject property, constructed in 2005, is improved with a one-story, 4,100 square foot* [5] bank branch building offering four lanes of drive-through service. Inside, there is a main banking area with five teller positions, a safe deposit vault, two coupon booths, and two half-baths. The building also contains a kitchenette, a conference room, storage closets, and a utility room. The site is further improved with 36 lined parking spots and a well-maintained exterior landscaped area. The exterior of the improvement consists of decorative block and metal sheet siding.
II. Conclusions of Law
At trial, each party presented one witness — a professional real estate appraiser — to offer an opinion as to the value of the property. The parties stipulated to the qualifications of the appraisers as experts. They also agreed that the two lots should be treated as a single economic unit. The experts both valued the subject property utilizing the income capitalization approach to valuation. Defendant’s expert also employed the cost approach. Neither expert used the sales comparison approach.
The experts offered their opinions that the subject property had a true market value for each of the years as follows:
[[Image here]]
a. Presumption of Validity
*375 The court’s analysis begins with the well-established principle that “[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity.” MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J.Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:
The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing Taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive, and certain in quality and quantity to overcome the presumption.”
[Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citations omitted)).]
The presumption of correctness arises from the view “that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.” Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J.Tax 439 (Tax 1981)); See also, Township of Byram v. Western World, Inc., 111 N.J. 222, 235, 544 A.2d 37 (1988). The presumption remains
in place even if the municipality utilized a flawed valuation methodology, so long as the quantum, of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity.
[Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517, 545 A.2d 746 (1988) (citing Pantasote, supra, 100 N.J. at 415, 495 A.2d 1308).]
“The presumption of correctness ... stands, until sufficient competent evidence to the contrary is adduced.” Township of Little Egg Harbor v. Bonsangue, 316 N.J.Super. 271, 285-86, 720 A.2d 369 (App.Div.1998) (citing Byram, supra, 111 N.J. at 235, 544 A.2d 37); See also City of Atlantic City v. Ace Gaming, LLC, 23 N.J.Tax 70, 98 (Tax 2006). To overcome the presumption, the plaintiff must present sufficient evidence to raise a debatable question as to the validity of the assessment. MSGW Real Estate, supra, 18 N.J.Tax at 376.
“In the absence of a R. 4:37-2(b) motion ... the presumption of validity remains in the ease through the close of all *376 proofs.” Id. at 377 (citations omitted). When determining whether a party has overcome the presumption, the court should weigh and analyze the evidence “as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.” Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995)). To overcome the presumption, the evidence “must be ‘sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.’” West Colonial Enters. LLC v. City of Orange, 20 N.J.Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J.Tax 405, 408 (Tax 1999)), aff'd, 18 N.J.Tax 658 (App.Div.2000), certif. denied, 165 N.J. 488, 758 A.2d 647 (2000).
Only after the presumption is overcome with sufficient evidence at the close of trial must the court “appraise the testimony, make a determination of true value and fix the assessment.” Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J.Super. 65, 75, 208 A.2d 153 (App.Div.1965)). If the court determines that evidence produced is insufficient to overcome the presumption that the assessment is correct, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312, 604 A.2d 580 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J.Tax 698, 703-04 (App.Div.1996).
At the close of Plaintiffs ease-in-chief, Defendant moved to dismiss the case for Plaintiffs failure to overcome the presumption of validity. The court denied the motion and placed a statement of reasons on the record.
*377 Of course, a finding that Plaintiff has overcome the presumption of correctness does not equate to a finding that the assessment is erroneous. To the contrary, the court’s finding merely permits it to address the question of what value should be accorded to the subject property. Once the presumption is overcome, the “court must then turn to a consideration of evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence.” Ford Motor Co., supra, 127 N.J. at 312, 604 A.2d 580 (quotations omitted). “[Although there may have been enough evidence to overcome the presumption of correctness at the close of Plaintiffs ease-in-chief, the burden of proof remain[s] on the Taxpayer throughout the entire case ... to demonstrate that the judgment under review was incorrect.” Id. at 314-15, 604 A.2d 580 (citing Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308).
b. Method of Valuation
“There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost.” Brown v. Borough of Glen Rock, 19 N.J.Tax 366, 376 (App.Div.) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996)), certif. denied, 168 N.J. 291, 773 A.2d 1155 (2001). “There is no single determinative approach to the valuation of real property.” 125 Monitor Street, LLC v. City of Jersey City, 21 N.J.Tax 232, 237-38 (Tax 2004) (citing Hird & Sons, supra, 87 N.J.Super. at 72, 208 A.2d 153), aff'd, 23 N.J.Tax 9 (App.Div.2005). The choice of the approach to determine value is ease specific, as it depends “upon the facts of each case and the reaction of the experts to those facts.” Ibid. (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963)).
Defendant urges that the cost approach is the more accurate method for determining the subject property’s value as it is a nearly new, special purpose, owner-occupied bank branch, designed in the unique style of the owner-occupant. The cost *378 approach is used to estimate the market value of relatively new properties and those that are not frequently bought or sold. Appraisal Institute, The Appraisal of Real Estate, 377-78 (13th ed. 2008). “In the cost approach, the appraiser analyzes the cost of the subject improvements by comparison to the cost to develop similar improvements as evidenced by the cost of construction of substitute properties with the same utility as the subject property.” Ibid. The appraiser estimates the cost of the land and the cost to construct a reproduction of the existing structure, and then deducts all accrued deprecation in the property being appraised. Ibid. Unlike Defendant, Plaintiffs expert considered the cost approach but ultimately rejected it as speculative in part because it fails to adequately account for market forces, such as vacancy and supply and demand.
Both experts relied on the income capitalization approach to value the subject property, though Defendant’s expert used it as support for his cost approach valuation. The income capitalization approach is the preferred method for estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 9 N.J.Tax 199 (App.Div.1986), aff'g 8 N.J.Tax 430 (1985), rev’d on other grounds, 108 N.J. 266, 528 A.2d 922 (1987). In the income capitalization approach, an appraiser analyzes a property’s capacity to generate future benefits and capitalizes the income into an indication of present value. The Appraisal of Real Estate, supra, at 445.
In the court’s opinion, the most appropriate means of determining the value of the subject property is capitalizing the income producible from its current use as a bank branch. See Midlantic Operating Admin. v. Township of West Caldwell, 20 N.J.Tax 446, 451 (Tax 2002); United Jersey Bank-Peoples Trust of NJ v. Borough of Lincoln Park, 11 N.J.Tax 549, 554 (Tax 1991); See also Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J.Tax 68, 79 (Tax 1996) (“The income approach is ... the proper method for determining the value of [property which produces income].”).
*379 c. Special Purpose Property
The court will first address an argument made by Defendant: that the subject is a special purpose property. It states that this property owner constructs its properties to comport with a unique design plan such that its customers immediately recognize the property as one operated by this specific owner upon laying eyes on it. It is on this basis that Defendant seeks to have the court implement the cost approach methodology. See Dworman v. Borough of Tinton Falls, 1 N.J.Tax 445, 452 (Tax 1980) (“The cost approach is normally relied upon to value special purpose or unique structures for which there is no market”), aff'd, 180 N.J.Super. 366, 434 A.2d 1134 (App.Div.), certif. denied, 88 N.J. 495, 443 A.2d 709 (1981); See also Transcontinental Gas, supra, 111 N.J. 507, 545 A.2d 746.
There are important traits which distinguish special purpose properties. Generally, they will possess the following characteristics: they will be (1) unique and specially built for the purpose for which they are used, (2) without a market or comparable sales, (3) unlikely to be converted without substantial economic expenditure, and (4) reasonably expected to be replaced or reproduced if destroyed. Tenneco, Inc.-Tennessee Gas Pipeline Div. v. Cazenovia, 104 A.D.2d 511, 512, 479 N.Y.S.2d 587 (N.Y.Sup.Ct.1984); appeal after remand, 134 A.D.2d 772, 522 N.Y.S.2d 250 (1987), appeal denied, 72 N.Y.2d 803, 532 N.Y.S.2d 369, 528 N.E.2d 521 (1988); see also Transcontinental Gas, supra 111 N.J. at 526-28, 545 A.2d 746; Hackensack Water Co. v. Borough of Old Tappan, 77 N.J. 208, 216, 390 A.2d 122 (1978) (value of the property depends on continuation of current use and could not be used for any other purpose); Assessors of Quincy v. Boston Consolidated Gas Co., 309 Mass. 60, 34 N.E.2d 623, 627 (1941) (improvement could not be used for any other purpose, and had very little removal value). Special purpose properties are often limited-market properties which have few potential buyers at a given time due to their specialized use, and often include manufacturing plants, railroad sidings, research and development properties, museums, schools, houses of worship, theaters, and sports arenas. Appraisal of Real Estate, supra, at 27-28, 271. They *380 often have unique designs or special construction utility which provide a functional utility for the intended use, but have limited conversion potential which restricts utility for other uses. Ibid.; General Motors Corp. v. City of Linden, 22 N.J.Tax 95, 127 (Tax 2005). The only means for valuing a special purpose property is via the cost approach because there will be insufficient comparable market transactions. Glen Pointe Associates v. Township of Teaneck, 10 N.J.Tax 380, 388 (Tax 1989) (citing Anaconda Co. v. Perth Amboy, 157 N.J.Super. 42, 384 A.2d 531 (App.Div.1978), vacated and remanded on other grounds, 81 N.J. 55, 404 A.2d 1155 (1979), aff'd, 12 N.J.Tax 118 (App.Div.1990)).
“However, property does not qualify as a specialty where it possesses certain features which, while rendering the property suitable to the owner’s use, are not truly unique. Dworman v. [Borough of] Tinton Falls, supra, 1 N.J.Tax at 455. Property should not be valued as a specialty merely because it contains certain features adapted to plaintiffs use.” Sunshine Biscuits, Inc. v. Borough of Sayreville, 4 N.J.Tax 486, 495 (Tax 1982). Property is best classified as special purpose where it is “property that ‘cannot be converted to other uses without large capital investment,’ such as a public museum, a church, or a highly-specialized production facility like a brewery.” Ford Motor Co., supra, 127 N.J. at 299, 604 A.2d 580 (quoting Sunshine Biscuits, supra, 4 N.J.Tax at 495 n. 3).
Defendant’s argument is unavailing. While the property may have been built specifically as a bank branch, none of the other factors are present. Defendant has not shown that significant expenditures would be necessary or that it would be economically infeasible for the property to be converted to another use, nor has Defendant demonstrated that it would be imperative to the community that this property be rebuilt as a bank branch were it destroyed. No showing has been made that the subject is one-of-a-kind or possesses any particular quality which makes it uniquely suited to Plaintiffs use, as a reservoir or gas pipeline would to its owner or to the community. See Hackensack Water, supra. The court does not agree that unique aesthetics which were “designed and constructed with very specific design materi *381 als,” as Defendant suggests, make the subject a special purpose property. As a result, the court remains unmoved from its earlier determination that the income capitalization approach is the appropriate method of valuation.
d. Expert Testimony
In addition to determining whether the expert’s qualifications are acceptable, the trial court must also decide as to whether the expert’s opinion is based on facts and data. Biunno, Current N.J. Rules of Evidence, comment 2 on N.J.R.E. 702 (2002). As construed by applicable case law, N.J.R.E. 703 requires that an expert’s opinion be based on facts, data, or another expert’s opinion, either perceived by or made known to the expert, at or before trial (citations omitted). “[A]n expert’s bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered.” Pomerantz Paper Corp. v. New Community Corp., 207 N.J. 344, 371, 25 A.3d 221 (2011). The rule requires an expert “to give the why and wherefore” of his opinion, rather than mere conclusions. Polzo v. County of Essex, 196 N.J. 569, 583, 960 A.2d 375 (2008); Jimenez v. GNOC, Corp., 286 N.J.Super. 533, 540, 670 A.2d 24 (App.Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996), overruled on other grounds, Jerista v. Murray, 185 N.J. 175, 883 A.2d 350 (2005).[6]
N.J.R.E. 703 bars admission into evidence of a net opinion, which is not supported by factual evidence or other data. Polzo, supra, 196 N.J. at 583, 960 A.2d 375. “An expert’s bare conclusion[ ], which is not supported by factual evidence, is inadmissible.” Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). However, an expert’s failure “to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers *382 sufficient reasons which logically support his opinion.” Pierre v. Townsend, 221 N.J. 36, 54, 110 A.3d 52 (2015); (citing Rosenberg v. Tavorath, 352 N.J.Super. 385, 402, 800 A.2d 216 (App.Div.2002)). However, the net opinion rule requires that experts “ ‘be able to identify the factual basis for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.’ ” Ibid. (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417, 605 A.2d 1079 (1992)). “An expert’s conclusion ‘is excluded if it is based merely on unfounded speculation and unquantified possibilities.’ ” Id. at 55, 110 A.3d 52 (quoting Grzanka v. Pfeifer, 301 N.J.Super. 563, 580, 694 A.2d 295 (App.Div.1997)) (quoting Vuocolo v. Diamond Shamrock Chem. Co., 240 N.J.Super. 289, 300, 573 A.2d 196 (App.Div.), certif. denied, 122 N.J. 333, 585 A.2d 349 (1990), certif. denied, 154 N.J. 607 (1998)). “[W]hen an expert speculates, ‘he ceases to be an aid to the trier of fact and becomes nothing more than an additional juror.’ ” Ibid. (citing Jimenez, supra, 286 N.J.Super. at 540, 670 A.2d 24). An expert “is not permitted to express speculative opinions or personal views that are unfounded in the record.” Ibid. Nor may “[a] party’s burden of proof ... be satisfied by an expert opinion that is unsupported by the factual record or by an expert’s speculation that contradicts that record.” Ibid. When contradicting facts in the record, the expert must use his expertise or personal knowledge of the facts; speculation, alone, that a witness incorrectly stated the facts is an insufficient basis for an expert’s conclusion. See Id. at 55, 110 A.3d 52. “Expert opinion is valueless unless it is rested upon the facts which are admitted or proved.” Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305, 108 A.2d 616 (1954) (citations omitted).
It is well settled in the realm of tax appeals that an expert’s reliance on subjective measures for calculation and application of adjustments is unacceptable. Greenblatt v. Township of Englewood, 26 N.J.Tax 41, 55 (Tax 2011) (“adjustments must have a foundation obtained from the market” with an “explanation of the methodology and assumptions used in arriving at the[ ] adjustments[ ]” otherwise they are entitled to little weight.). In Dworman, supra, 1 N.J.Tax at 458 (citations omitted), this court established that “[t]he opinion of an expert depends upon the facts *383 and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard.” Thus an expert’s opinion is only as good as the data upon which the expert relied. See Congoleum Corp. v. Township of Hamilton, 7 N.J.Tax 436, 451 (Tax 1985) (Adjustments must be adequately supported by objective data.); Kearny Leasing Corp. v. Township of Kearny, 6 N.J.Tax 363, 376 (Tax 1984), aff'd o.b., 7 N.J.Tax 665 (App.Div.1985), certif. denied, 102 N.J. 340, 508 A.2d 215 (1985). “An expert’s conclusion rises no higher than the data which provide the foundation.” City of West Orange v. Goldman, 2 N.J.Tax 582, 588 (Tax 1981) (citations omitted). “Expert opinion unsupported by adequate facts has consistently been rejected by the Tax Court.” Hull, supra, 16 N.J.Tax at 98 (citing Willow/Leonia Assocs. v. Borough of Leonia, 12 N.J.Tax 338, 344 (1992)).
Still, the court is mindful of its obligation “to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question.” Glen Wall Associates v. Township of Wall, 99 N.J. 265, 280, 491 A.2d 1247 (1985) (citing New Cumberland Corp. v. Borough of Roselle, 3 N.J.Tax 345, 353 (Tax 1981)). However, to enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record. Here, the court was presented with factual information, data, and analysis of comparable property sales. The court’s independent determination of value must be based “on the evidence before it and the data that are properly at its disposal.” F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430, 495 A.2d 1313 (1985). With these precedents in mind, the court examines the experts’ reports and testimony, and makes the findings discussed below.
III. Income Capitalization Approach
i. Market Rent
“Central to an income analysis is the determination of the economic rent, also known as the ‘market rent’ or ‘fair rental value.’ ” Parkway Village, supra, 108 N.J. at 270, 528 A.2d 922. *384 “Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area.” West Colonial Enters., supra, 20 N.J.Tax at 583 (quoting Harclay House v. City of East Orange, 18 N.J.Tax 564, 568 (Tax 2000), aff'd 344 N.J.Super. 296, 19 N.J.Tax 566, 781 A.2d 1085 (App.Div.2001), certif. denied, 171 N.J. 338, 793 A.2d 716 (2002)). The parties first determine the total potential gross income attributable to the subject at full occupancy. The Appraisal of Real Estate, supra, at 457.
Both experts provided the court with six leases which they deemed comparable to the subject property for the purpose of determining market rent. To be a reasonably comparable lease, a property must be substantially similar to the subject. Congoleum Corp., supra, 7 N.J.Tax at 445. When using comparable properties to determine true value, the parties should use market transactions. Market rent is defined as “[t]he most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the typical lease agreement.” Appraisal of Real Estate, supra, at 453.

Plaintiffs Analysis

Plaintiffs expert classified the subject property as “average— good Class C” bank branch building as categorized by the Marshall and Swift cost estimating service. In preparing his report, the expert used 1999 as the year of construction, however, at trial, the expert conceded that the property was actually constructed in 2005. More tellingly, he admitted he did not verify the construction date by looking at the deeds or the owner’s records prior to completing the reports.
In the appraisal report submitted to the court, Taxpayer’s expert analyzed five net bank branch leases and one gross lease, which he characterized as typical leases in the area. He selected comparable leases for properties with what he deemed to be the same highest and best use as the subject.
The report also includes a non-exhaustive survey of what the expert described as the northern New Jersey market for bank *385 branch leases, which purports to demonstrate the abundance of available bank branch locations during the relevant time period, and the corresponding decline in demand and asking prices. He maintains this shift started after mid-2007 and was caused by the financial crisis which occurred at that time. According to the expert, between 2009 and 2012, there was a myriad of similar properties available for purchase or rent, resulting in a saturation of the market for bank branch locations in the area; thus they were not in demand, making them less valuable. Based on a paired lease analysis and “market study,” the expert determined that bank branch rents were rising moderately until the third quarter of 2007, and then declined thereafter. Therefore, he made adjustments based on the timing of each comparable lease’s inception, applying a positive 2.5% annual adjustment up to October 1, 2007 and applying a negative annual adjustment of 2.5% per annum thereafter.[7]
The expert then made two adjustments based on location. The first is a 5% downward adjustments to five of the six compara-bles [8] because the per capita income of residents living within a one-mile radius of those locations was significantly, according to the appraiser, higher than the per capita income of people living within one mile of the subject property. The second is a 5% positive adjustment to all his comparables because the subject property is located in a busy business district, in a county seat, near a courthouse and county administration buildings while the comparable leases were not located in such visible or highly trafficked areas. Except for the one lease with no per capita adjustment, the two adjustments are offsetting and constitute the 0% location adjustment in the report’s adjustment grid.
*386 The final adjustments were made for physical condition, which the appraiser defined as building size, configuration, building quality, parking access, the presence or absence of drive-through access, and other similar components.
Plaintiffs comparable lease 1, dated January 1, 2007, is for a 2,400 square foot building located at 115 Broadway, Elmwood Park, Bergen County. It does not offer drive-through service, but is a stand-alone building. The lease covers a five-year term at a net rental value of $30.08 per square foot. The expert made all of the adjustments stated above. The expert also made a positive 5% adjustment for the comparable’s lack of drive-through access. The resulting adjusted economic rent per square foot for each tax year is $32.89 in 2009, $32.06 in 2010, and $31.27 in 2011.
Plaintiffs comparable lease 2, dated April 17, 2007[9] is for 5,156 square feet of space in the mixed-use, multi-tenanted bank and office property located at 550 Kinderkamack Road, Oradell, Bergen County. The bank offers three lanes of drive-through service. The lease covers a five-year term at a net rental value of $27.00 per square foot. To this comparable, Plaintiffs expert made the adjustments listed above and a 5% positive physical adjustment for the comparable’s larger size, resulting in an adjusted economic rent of $28.01 in 2009, $27.30 in 2010, and $26.62 in 2011.
Plaintiffs comparable lease number 3, dated April 1, 2009, is for a 2,545 square foot building located at 995 Bloomfield Avenue, West Caldwell, Essex County. The site offers two-lanes of drive-through service and is a stand-alone facility. The lease covers a five-year term with a net rental value of $35.00 per square foot. Plaintiffs expert made the adjustments listed above, resulting in an adjusted economic rent of $35.46 in 2009, $34.58 in 2010, and $33.71 in 2011.
Plaintiffs comparable lease 4, dated November 1, 2010, is for a 2,927 square foot space located at 161 North Franklin Boulevard, *387 Ramsey, Bergen County. The site offers two-lane drive-through service and is located inside a mixed-use office and bank building. Plaintiff’s expert found the net rental value was $25.03 per square foot after deducting $4 per square foot for taxes. The expert then made the adjustments listed above and a positive 5% physical adjustment due to the comparable’s lesser quality of construction, resulting in an adjusted economic rent of $27.67 in 2009, $26.99 in 2010, and $26.33 in 2011.
Plaintiff’s comparable lease 5, dated March 1,2008, is for a 3,000 square foot building located at 328 South Avenue, Fanwood, Union County. The site offers three lanes of drive-through service and is a stand-alone bank branch. The lease covers a fifteen year term at a net rental value of $35 per square foot. Plaintiff’s expert made the adjustments listed above and a negative 5% physical adjustment for the comparable’s newer condition,[10] resulting in an adjusted economic rent of $32.78 in 2009, $31.95 in 2010, and $31.16 in 2011.
Plaintiffs comparable lease 6, dated August 9, 2010, is for a 2,500 square foot space located at 350 Ramapo Valley Road, Oakland, Bergen County. The site offers a one-lane drive-through facility and is situated in a strip mall. The lease covers a ten year term at a net rental value of $32 per square foot. Plaintiffs expert made the adjustments listed above, resulting in an adjusted economic rent of $33.50 in 2009, $32.67 in 2010, and $31.87 in 2011.
Having made the adjustments, Taxpayer’s expert calculated the average rent of the six properties to be $31.72 per square foot for tax year 2009, $30.93 in 2010, and $30.16 in 2011, and determined that the market value of the subject property is $32 per square foot in tax year 2009, $31 in 2010, and $30 in 2011. Applying the rental figures to the 4,050 square feet of the subject property,* [11] *388 Plaintiff proposes that the Potential Gross Income (“PGI”) of the subject property is $129,600 in tax year 2009, $125,550 in 2010, and $121,500 in 2011.

Defendant’s Analysis

Defendant’s expert relies upon six bank branch leases, five of which are located in Bergen County. All of the leases are for stand-alone bank branch buildings to which the expert made adjustments based on time, location, building size, condition of the building, and the quality of the drive-through facilities. His time adjustments were based upon an analysis of bank sales and leases during the time in question. He concluded that the market was rising 5% annually until 2007 and then stayed relatively flat thereafter.
Defendant’s comparable lease 1, dated January 1, 2006, is for a 2,825 square foot building located at 325 Garden Street, Carlstadt, Bergen County. The site offers two-lanes of drive-through service. The lease is for a term of ten years with an average net rental value of $42.24 per square foot during the first five years. The expert made a positive 9% adjustment for time, a positive 10% adjustment for location, a negative 5% adjustment for building size, and a positive 5% positive adjustment for the quality of the drive through. After making adjustments, the resulting economic rent is $50.65 for the years under review.
Defendant’s comparable lease 2, dated July 1, 2007, is for a 4,536 square foot building located at 1045 Clifton Avenue, Clifton, Passaic County. The site offers two-lanes of drive-through service. The lease is for a 10 year term with a net rental value of $37.91 per square foot over the first five years. The expert made a positive 1% adjustment for time, a positive 10% adjustment for location, a positive 5% adjustment for building size, a positive 20% adjustment for condition due to the building’s age, and a positive 5% adjustment for the number of drive-through lanes. After making the adjustments, the resulting economic rent is $53.60 for the years under review.
Defendant’s comparable lease 3, dated August 29, 2008, is for a 2,766 square foot building located at 5 Washington Avenue, Du- *389 mont, Bergen County. The site offers two-lanes of drive-through service. The lease is for a term of twenty years with an average net rental value of $65.00 per square foot during the first five years. The expert made a negative 5% adjustment for building size and a positive 5% adjustment for the number of the drive-through lanes. Because the adjustments were offsetting the adjusted rent per square foot is $65.00.
Defendant’s comparable lease 4, dated February 6, 2009, is for a 4,280 square foot building located at 803 Route 17 South, Paramus, Bergen County. The site offers two bays of drive-through service. The lease is for a five year term with a net rental value of $49.36 per square foot. The expert made a negative 5% adjustment for size and a positive 5% adjustment for the number of drive-through lanes. Because the adjustments were offsetting the adjusted rent per square foot is $49.36.
Defendant’s comparable lease 5, dated April 15, 2010, is for a 4,207 square foot building located on Spring Valley Road, Para-mus, Bergen County. The site offers three bays of drive-through service. The lease is for a twenty year term with an average net rental value of $61.80 per square foot over the first five years. The expert made a positive 5% adjustment for building size and a negative 5% adjustment for condition, resulting in an adjusted rent per square foot of $61.80.
Defendant’s comparable lease 6, dated August 1, 2011, is for a 2,325 square foot building located at 19 County Road, Cresskill, Bergen County. The site offers two-bays of drive-through service. The lease is for a fifteen year term with an average net rental value of $64.25 per square foot over the first five years. After making 5% negative adjustments for building size and condition and a positive 5% adjustment for the number of drive-through lanes, the expert determined that the adjusted economic rent of the comparable is $61.29 per square foot for all the years under review.
Defendant’s expert calculated that the average rent of the six properties was $56.95 per square foot for tax years 2009, 2010, and 2011, and determined that the market value of the subject proper *390 ty was $60 per square foot. Applying the rental figures to the 4,144 square feet of the subject property,[12] the expert concluded that the PGI of the subject property was $248,600 per square foot for the years in question.

The Court’s Analysis

The court accepts the experts’ opinions that the highest and best use for the subject property as improved is its current use — as a bank branch location.
At the outset, the court notes that the weight it gives Taxpayer’s expert’s testimony and analysis is affected by the fact that he used an incorrect construction date in his report. As such, the court finds that his testimony is less reliable and will be afforded less weight as indicated below. During cross-examination, Defendant demonstrated that Plaintiffs expert did not verify his information with the property record cards for the two lots, which clearly indicate that the subject property was constructed in 2005. He also failed to review the deed of purchase for the subject, and failed to engage in discussions with Taxpayer to determine what, in the court’s view, are easily verifiable facts. Plaintiffs expert provided conflicting testimony regarding his time analysis, wherein his reports indicates 2.5% annual adjustment, but he testified to 5% adjustments. He also provided conflicting testimony on other issues at trial.
The court does not give weight to the expert’s “Market Overview” section listing several bank branch facilities which he states were on the market during the relevant time period. That section provides little more information than the rental rates at which landlords were seeking to lease their properties. There is no method of independent verification for any of the information provided, and assuming its accuracy, that the higher rates sought by those landlords, which were subsequently abandoned for the lower rates listed in the report, were reasonable. No evidence has been offered to that effect. The expert also did not include any *391 information regarding prior leases for those properties in order to confirm, in fact, that the market was forcing landlords to accept lower rents. There was no information offered regarding the sizes of these banks, their dates of construction, in some eases whether they are iree-standing, or whether these banks offer drive-through service. In short, there is no evidence to suggest that any of these properties is even remotely comparable to the subject. Without any of this information, the court has no choice but to find that any conclusion based on these facts, without more, is unsupported.
The court is not persuaded by Plaintiffs time adjustment. Notwithstanding the contradiction in the expert’s report and testimony, the adjustment is also based on the expert’s “Market Overview” section, which the court, as stated above, does not find it credible. To the extent the expert asks the court to rely on the existence of vacant bank branch properties as evidence of a market decline, the court will not do so. It would be duplicative to give them any weight here as they would have contributed to the vacancy rate, applied below. Additionally the assertion that the expert’s practice has observed a decline in the market is not accepted, as it is not based on any data which was made available to the court or which could be examined by Defendant. No third party analysis was provided to show a market decline. Finally, the court finds the expert’s paired lease analysis,[13] which includes only two data points, to be insufficient to extrapolate into a determination that the market was in decline. Lease 6 was a renewal, such that a drop in rent could be attributable to a number of other factors unrelated to market conditions and which were not ruled out by Plaintiff. “Special motivations may apply in a renewal situation — the landlord’s desire to retain the tenant, the tenant’s desire not to incur the inconvenience and expense of relocation. Thus a renewal rent, without extensive investigation *392 (apparently not done by defendant’s appraiser), is a dubious basis for establishing market rent.” International Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J.Tax 403, 429 (Tax 2004).[14] The appraiser did not eliminate any of these possibilities. For Lease 4, too, the expert failed to eliminate the possibility that rent declined due to factors other than a decline in the market; he simply pointed to the lower rent for the second term as evidence of a market decline. The expert’s assumption is not one that the court can adopt, as it is not based on any facts.[15] The court does not find the adjustments for time to be well supported.
Our Supreme Court has held “value for purposes of taxation has some measure of permanence which renders it secure against general temporary inflation or deflation.” Hull, supra, 16 N.J.Tax at 96 (quoting Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 163, 65 A.2d 828 (1949)). Indeed, this jurisdiction has recognized that “true value must be fairly constant and must be gauged by conditions, not temporary and extraordinary, but by those which over a period of time will be regarded as measurably stable.” Ibid. (quoting Berkley Arms Apartment Corp. v. City of Hackensack, 6 N.J.Tax 260, 286 (Tax 1983)). Stabilized income is defined as
income at that point in time when abnormalities in supply and demand or any additional transitory conditions cease to exist and the existing conditions are those expected to continue over the economic life of the properly; projected income that is subject to change, but has been adjusted to reflect an equivalent, stable annual income.
[The Appraisal Institute, The Dictionary of Real Estate Appraisal, 185 (5th ed. 2010) ].
The court is also aware that there was a sharp national economic downturn which started in 2007 or 2008. However, there is *393 nothing in the record which demonstrates how the market changes may have affected bank branches specifically. The court cannot take notice of general economic conditions to then use as a basis to support Plaintiffs proposition that there was a decline in bank branch values, much less quantify that suggested decline. It would be excessive for the court to allow adjustments beyond the economic changes which would already be reflected by the agreed upon renal rate for each comparable lease. Thus, the court finds that an adjustment for market conditions must be disallowed because it is not based on any credible market data.
Other adjustments were not adequately explained. The expert made upward adjustments of five percent to all six of his comparable leases due to the subject property’s location in downtown Hackensack, which he viewed to be a better location. When asked why he made a five percent adjustment, rather than a six percent adjustment or any other number, he stated that, “There’s no way to really quantify specifically from any market derived calculation, it seemed like the — the adjustment was warranted and I applied my best judgment in that regard.” The court finds that this adjustment was not based on any data and for the reasons set forth in the eases cited above, the court views it as unreliable. Likewise, adjustments for age are rejected because they are not supported.[16]
The expert’s negative 5% adjustment to five of the six properties based on the per capita income of the surrounding areas is *394 also rejected. At trial, he testified that he knew of no analysis that supported the conclusion that there is a positive correlation between bank branch rents and the per capita income of surrounding residents. Because there were no facts or data presented which show a correlation between per capita income and bank branch rents, the court considers this adjustment to be suspect when analyzed under the framework set forth above, and it is rejected.
Upon examination of the expert’s report, testimony, and reasons for selecting leases, only one lease suggested by the Plaintiff is entitled to any weight. Comparable lease 1 is afforded no weight on the basis that it does not provide any drive-through service and the lot is too small, as the City’s expert points out, to support the subject improvement or any bank branch which does include drive-through bays. In the court’s view, Plaintiff's lease 1 is not comparable to the subject property and will not be given any weight in the court’s analysis.
In analyzing comparable lease 5, the expert only used part of the lease. A subsequent work order which the lessee bank included in the transaction was not reviewed by the expert. It is incumbent upon experts to verify the information upon which they rely. The Appraisal of Real Estate, supra, 304 (“Appraisers should verify information with a party to a transaction to ensure its accuracy and to gain insight into the motivations behind each transaction. The buyer’s and seller’s views of precisely what was being purchased at the time of the sale are important.”). The lease will not be relied upon by the court because it was not reviewed and all of the terms could not have been verified. Moreover, tenant’s use of the property was non-exclusive; it was required to allow a neighboring property to use the parking lot and there was another building located on the lot. The court views this property as too dissimilar to be comparable and it is afforded no weight.
*395 Plaintiffs leases 2, 4, and 6 all were located in mixed-use buildings. The court views that difference to be important, making them insufficiently comparable to the subject.
Only comparable lease three is given any weight. It is only one of two leases submitted by Taxpayer for a bank branch in a freestanding building with drive-through service.[17] The expert testified at trial that he did not review comparable lease 3, but that he did review the terms of the transaction. The court is satisfied that the expert verified the terms of the lease. Without adjustments, the court considers this lease at the unadjusted $35.00 per square foot for all of the tax years subject to this opinion.
Defendant’s leases share some of the same problems as Plaintiffs. In the case of comparable lease 2, the lease is an extension of a prior lease. Moreover, the lease terms were agreed to more than three years in advance of the first valuation date of this appeal, while the lease term did not begin until more than two years after the signing date. The parties’ agreement with respect to the annual rent could not have been based entirely on what the market would demand during the years under review, since they fixed the rental amount far in advance. Finally, there is a discrepancy with respect to the square footage, with the amended lease indicating a rental area approximately 800 square feet greater than the amount in the expert report. For all those reasons, the court will not give lease 2 any weight.
Both comparable leases 5 and 6 were actually land leases. The tenants constructed both improvements, a fact for which there were no adjustments by the expert. The expert did suggest that the leases were still viable because a lease for the land and the improvement would warrant a higher rental rate than a lease for only land. The court, however, finds that this statement is unsupported, and that fundamentally, these land leases are not comparable due to the nature of the transactions by which they were leased.
*396 The court finds that Defendant’s lease 1 to be a comparable lease probative of the subject’s true value. Plaintiff contends that the lease does not represent a market transaction, based on the fact that one of the bank directors was also a partner of the lessor, and that it should not be considered. However, Defendant’s expert pointed out that the New Jersey Department of Banking and Insurance conducted a rental study which concluded that the agreed-upon rent was within market prices. N.J.A.C. 3:1-10.2 requires a bank which purchases or leases premises from an affiliated party to “file a detailed real estate application concerning the proposed transaction with the Commissioner for his or her approval.” N.J.A.C. 3:1-10.3 requires the Commissioner to deny the application unless the Commissioner is satisfied that
(1) the terns and conditions of the proposed transaction are in the best interests of the institution; and (2) The applicant provides a written attestation of an independent appraiser that the terms and conditions of the proposed transaction are equal to or better than those which the institution would have obtained hat the premises been ... leased in an arm’s length transaction with a non-affiliated third party.
The court, therefore is satisfied that use of this lease is proper.
Defendant’s comparable leases 3 and 4 will also be given weight by the court. On cross-examination of lease 4, which was new construction, Defendant’s expert stated that the tenant had to obtain approvals for development and that he did not know if the tenant provided any of the financing for construction. Plaintiff alleges that this fact negates lease 4 as a market transaction. The court is not persuaded that the fact that the tenant obtained the approvals affects the comparability of this lease. Plaintiffs additional suggestion that the tenant may have helped finance the construction is not based on any fact in the record and will not affect the court’s analysis. Consideration of both leases is proper.
Though Defendant’s expert did explain why he made adjustments for market conditions, time, location, building size, age/eon-dition/quality, or drive-through he did not explain how he arrived at the quantum of those adjustments or support his conclusions with market data.[18] For example, the expert made location *397 adjustments for what he described as inferior locations of two of the comparable leased properties. He made a 10% upward adjustment for that difference, but did not explain how he arrived at that number or state that it was based on any market data or other information which would typically be relied upon by someone with his expertise. For that reason, the court cannot determine if 10% is the correct amount of adjustment, or if the adjustment is actually 5% or 15%. The court therefore, in accordance with precedent establishing requirements for experts, cannot accept Defendant’s expert’s adjustments. The expert did not satisfy the standard set forth above because he failed to explain the “whys and wherefores.” As a result, leases 1, 3, and 4 will be considered at their face rental values of $42.24,[19] $65.00 and $49.36 respectively.
ii. Vacancy and Collection Rate
Next, the parties reduced their potential gross income determinations by their determinations as to the vacancy rate, which resulted in effective gross income. See Appraisal of Real Estate, supra, at 457.
Both experts calculated the vacancy and collection rate based on their own survey of available branches and analysis of market conditions. Plaintiffs expert found that the vacancy and loss factor is 5% for tax year 2009, 7.5% for tax year 2010, and 8.5% for *398 tax year 2011. Defendant’s expert used a stabilized 4% vacancy and collection rate for all years covered by this appeal.
Plaintiffs expert arrived at his vacancy and collection rate by conducting a market overview of bank branch locations in Bergen County and by interviewing banking personnel whose responsibility is leasing bank branches. The results of his analysis revealed that since 2007 there has been a glut of available bank branch locations, resulting in a decline in demand and rental rates. The expert demonstrated that between 2007 and 2011 the number of FDIC insured institutions in New Jersey declined by 16%, but did not state whether that decline occurred primarily in any specific area of New Jersey or if the decline resulted from a number of mergers and acquisitions which may have occurred during that time period. He also did not know if there were fewer bank branch locations operating in northern New Jersey during the years under review.
In calculating his vacancy and loss factor, Defendant’s expert “reviewed the historical vacancy at the subject property, surveyed the local market, had conversations with market participants, and reviewed market studies.” He reviewed a “Brunelli & Co.” report of vacancy rates along New Jersey’s major highways and testified 0.5% of his 4% vacancy and non-collection rate is attributable to non-collection. The Brunelli & Co. report indicates that vacancy rates were never lower than 4% during the years in question, yet the expert used lower numbers for his vacancy rate.
Based on a review of the testimony, the documents submitted into evidence, and after giving due consideration to the appraisers’ sources of information, the court finds that the appropriate vacancy and collection rate is 6%.
iii. Operating Expenses
The experts each calculated an operating expense rate which they used to reduce the subject’s effective gross income to produce net operating income. See The Appraisal of Real Estate, supra, at 457.
The largest difference between the two experts in their calculations of operating expenses was Plaintiffs inclusion of broker fees *399 and a miscellaneous fee. Both experts calculated their operating expenses based upon published studies and conversations with professionals in the field.
Plaintiffs expert attributed a management fee of 4% to the subject property. The expert relied on Price Waterhouse Cooper’s “Net Lease Management Fees” category of the “PwC Investor Survey,” interviews with bank portfolio managers, and providers of management services when determining his management and brokerage fees. Based upon his review of published studies and his conversations, Plaintiffs expert opined that these fees generally range from 3% to 5%. He also attributed an additional real estate brokerage fee of 5% to the subject property based upon a review of those same sources.
Defendant’s expert determined that the management and leasing fees of the subject property would be 5% based upon his experience within the market and a review of market publications, including the PwC Investor Survey of national strip mall centers, as he found this report to be the one most closely related to the subject property. He testified that management fees include administration, accounting, brokerage fees, and legal expenses were included in his calculation. The expert attributed 3% to management and 2% to real estate brokerage fees. Defendant admits that the average management fee from the “PwC Investor Survey” was 3.53% for the years under appeal and that the average leasing commission was 4.45%; he used lower rates because the rates for bank branches are lower than the rates for national strip shopping centers.[20]
Even accepting the numbers contained in the PwC surveys as reliable, the court does not agree with Plaintiffs conclusion on this issue. Plaintiffs expert’s surveys show an average net lease brokerage fee of 3.8%, while he used a 5% rate. The expert did not adequately explain the discrepancy between the average contained in the studies he relied upon and his determination of the *400 brokerage fee. In light of the above-referenced precedents, the court finds that a 4% management fee and a 4% brokerage fee, based on the evidence and testimony of the experts, to be reasonable.
Both experts also applied a replacement reserves fee. Plaintiffs expert relied upon the “Kopacz Investor Survey Reserve Allowances” to determine that the appropriate fee for the building was $0.35 per square foot, or 0.74%. Defendant’s expert stated that the cost of reserves for replacement would be 2% of the effective gross income, but failed to supply any explanation of how he arrived at that number. The court finds that a 1% replacement reserves fee is appropriate.
Plaintiffs expert also included a 1% miscellaneous fee for other costs of ownership such as professional fees, excess insurance, bank charges, carrying costs during periods of vacancy, and other incidental costs of ownership that are not accounted for in the other categories of expense. The court finds that a 1% charge is supported by the record.
iv. Capitalization Rate
The experts each developed a capitalization rate to convert their net operating income determinations into overall values. The overall capitalization rate is an “income rate for a total real property interest that reflects the relationship between a single year’s net operating income expectancy and the total property price or value.” The Appraisal of Real Estate, supra, at 462. The overall capitalization rate is “used to convert net operating income into an indication of overall property value.” Ibid.

Plaintiffs Approach

Plaintiffs expert did not offer a market derived capitalization rate. He stated that there was insufficient data for analysis as he was unable to find stabilized building sales with brokerage commissions, rent commissions, tenant improvement allowances, rent levels, remaining lease terms, renewal options, and expense and recovery options similar to those of the subject property.
*401 Instead, the expert relied upon PwC’s investor survey, the Real Estate Research Corporation’s (“RERC”) investor survey, and the American Council of Life Insurance’s (“ACLI”) published quarterly investment bulletin to develop a capitalization rate. He determined that the property was a RERC Tier 2 property,[21] and considered the rates for the third and fourth quarters of 2008, 2009, and 2010. This produced a reconciled RERC overall capitalization rate of 8.75% for the 2009 tax year, 9.00% for the 2010 tax year, and 8.75% for the 2011 tax year.
The appraiser also looked to the American Council of Life Insurance’s capitalization rates on retail worth less than $2,000,000. Using the relevant data, the expert determined that the ACLI capitalization rates were 8.10% for tax year 2009, 8.75% for tax year 2010, and 9.00% for tax year 2011.
The expert also relied on the Band of Investment technique, which includes a component reflecting the requirements of assumed mortgage financing, based on market factors, and a component reflecting the requirements of the equity investor. “This technique is a form of ‘direct capitalization’ which is used ‘to convert a single year’s income estimate into a value indication.’ The technique includes both a mortgage and an equity component.” Hull, supra, 16 N.J.Tax at 80-81 (Tax 1996) (citing Appraisal Institute, The Appraisal of Real Estate at 467 (10th ed. 1992)).
Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors must anticipate receiving a competitive equity cash return commensurate with the perceived risk, or they will invest their funds elsewhere.
[The Appraisal of Real Estate, supra, at 505.]
In “using the Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitaliza *402 tion rate analysis by furnishing ‘reliable market data ... to the court as the basis for the expert’s opinion so that the court may evaluate the opinion.’ ” Hull, supra, 16 N.J.Tax at 82 (quoting Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 279-80, 491 A.2d 1247 (1985)). “For these purposes, the Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance.” Id. at 82-83. Appraisers may also use data collected and published by Korpacz Real Estate Investor Survey. Id. at 83. “By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers.” Ibid.
In his band of investment analysis for tax year 2009, the expert used a 6.75% interest rate for his mortgage component, a 22-year mortgage amortization period, and a 7% equity-dividend rate. After adopting a 65% loan-to-value ratio, his band of investment analysis produced an 8.13% capitalization rate. For tax year’ 2010, he assumed a 7.00% mortgage interest rate, a 65% loan-to-value ratio, a 25-year amortization period, and an equity-dividend of 9.00%, resulting in a band of investment capitalization rate was 8.66%. For tax year 2011, Plaintiffs expert used a 6.25% mortgage interest rate, a 20-year amortization period, a 65% loan-to-value ratio, and a 9.00% equity dividend, resulting in a rate of 8.85%.
After analyzing each of the different methods, Plaintiff submitted to the court its final determination that the capitalization rate for the subject property of 8.25% for tax year 2009, 8.75% for tax year 2010, and 8.75% for tax year 2011.

Defendant’s Approach

Defendant’s expert was able to develop a market derived capitalization rate by analyzing the sale of the property in comparable lease 1, discussed above, in Carlstadt, Bergen County. The sale price of the land and building was $1,675,000 and the net operating income was $117,040. This rendered a capitalization rate of 6.99%.
*403 The expert also relied upon both the PwC survey and ACLI’s “Commercial Mortgage Commitments,” with the caveat that the ACLFs tables were of limited use because a local bank was more apt to lend on the subject property than a large life insurance company. The expert explained that his selection was based “upon published data as well as [his] knowledge of the mortgage interest rates and the local market.”
In his band of investment analysis for tax years 2009 and 2010, Defendant’s appraiser posited a 5.50% interest rate for his mortgage component, a 25 year amortization period, a 70% loan-to-value ratio, and a 6% equity-dividend rate. His band of investment analysis produced a 6.96% capitalization rate. For tax year 2011, the expert utilized a 5.00% mortgage interest rate while all other figures remained constant. The resulting band of investment capitalization rate is 6.71%.
Defendant’s expert concluded that the capitalization rate is 6.96% in 2009, 6.96% in 2010, and 6.71% in 2011.

The Court’s Analysis

The court does not accept Plaintiffs capitalization rate. It first characterizes the property as EEEC tier 2, even though the property was approximately three years old on the first valuation date. Moreover, the court does not accept the expert’s opinion that the property is in a good to average location when, in his report, he determined an upward adjustments to his comparable leases were warranted due to the subject’s prime location.
The court finds that the better reasoned analysis was submitted by Defendant. The ACLI tables are an accepted means of determining the capitalization rate. See Glen Wall Assocs., supra, 99 N.J. at 279-80, 491 A.2d 1247. The court finds that the rates submitted by Defendant are better supported, and will apply the 6.96% rate to tax years 2009 and 2010 and 6.71% for tax year 2011.
v. Determination of True Value Using the Income Capitalization Approach
Based on the above analysis, the court finds that the true value of the subject, as of the valuation dates, is as follows:
*404 [[Image here]]
IV. Cost Approach
The cost approach is more often used when the property is new or suffers only minor depreciation, where there is a lack of market activity, preventing use of another valuation method, or where there is proposed construction, special purpose, or other properties not frequently exchanged on the market. Appraisal of Real Estate, supra, at 382. “The cost approach is particularly important when a lack of market activity limits the usefulness of the sales comparison approach and when the property to be appraised — e.g., single-family residences — is not amenable to valuation by the income capitalization approach.” Ibid.
When determining the highest and best use of the property as vacant, Defendant’s expert stated that the lot could accommodate a variety of uses. As the lot is zoned commercially, he concluded that the highest and best use of the site as if vacant is for its development with a commercial use in accordance with zoning. The court agrees with this determination.
Defendant’s expert provided the court with what he determined to be six comparable land sales to establish the value of the land as vacant. The court will not describe or analyze the comparability of those sales because the court cannot accept Defendant’s replacement methodology for the reasons stated below.
*405 i. Replacement Costs
Defendant’s expert calculated the cost of replacing[22] the improvements on the subject property. First, he independently calculated it by relying upon the “Marshall & Swift Valuation Service.” In so doing, he classified the building on the subject property as a “Class C” “Good to Excellent” building.
Included in the report’s addendum are seventeen pages with data from the “Marshall & Swift Calculator Method.” The calculator method involves looking at the various tables to determine the class which best describes the building, manually calculating the cost of the improvements and multiplying the cost by current cost multipliers and then by local multipliers.
At trial it was revealed that the expert did not use the calculator method and did not rely upon the tables contained in his expert report. Instead, he relied upon a computer program[23] created by the “Marshall & Swift Valuation Service.” He was then asked if the same numbers were used in both the computer program and the calculator method, if the two methods would produce the same result. The expert replied that, “They should come out very similar (sic).”
As a result of this revelation, the court cannot give Defendant’s reproduction cost analysis any weight. The expert came to a conclusion of value based on a process not included in his report. There is no documentation for the method that was actually used, and because the expert did not specifically state which numbers he used from the many tables in his addenda, or how those numbers were used to calculate value, there is no means of verification. Though Defendant points out that the numbers contained in the *406 addenda are “correct and accurate,” the court has no way of knowing that those numbers were, in fact, entered into the computer program, especially given that the computer program produced a different value from the value which would result from the use of the addenda in the calculator method. While the court accepts as true Defendant’s assertion that the computer program is commonly used by appraisers, the court cannot assess the program’s accuracy or use it to determine true value in this case. Moreover, the differences that result from the computer program and a mathematical calculation based on the tables included in the report’s addenda went unexplained. While the differences might be small, the court has no way of knowing how it will ultimately affect true value or Defendant’s reconciliation of its two valuation approaches. Nor can the court determine how the difference would affect the expert’s reconciliation between his cost approach and his income approach.
ii. Conclusion of True Value Using the Cost Approach
For the above stated reasons, the court does not have sufficient credible evidence with which to determine the value of the subject using the cost approach.
V. Conclusion
Having found the fair market value, the court must now determine the correct assessment through the application of the chapter 123 ratio to the fair market value. See N.J.S.A. 54:1-35a. “Chapter 123 must be noticed by the Tax Court judge.” Weyerhaeuser Co. v. Closter Bor., 190 N.J.Super. 528, 543, 464 A.2d 1156 (App.Div.1983); Passaic Street Realty Assoc. v. Garfield, 13 N.J.Tax 482, 487 (Tax 1994); see also 1530 Owners Corp. v. Borough of Fort Lee, 135 N.J. 394, 397, 640 A.2d 811 (1994) (setting forth “a basic understanding of the methodology for formulating the chapter 123 ratio____”).
The formula for determining the subject property’s ratio is:
Assessment -¡- Trae Value = Ratio
Here, that equation is represented as follows:
*407 Tax Year 20tf9 $'3458^500 - $2.49X009 = 1.439
Tax Year 2Ó1D '$'3,38^500 * 52,492,000 = i.439
Tax Year 2Gt'l 33.585^00 $2,535,000 = 1382
The chapter 123 average ratio for the City of Hackensack for tax year 2009 was .9429 with an upper limit of 1.0833 and a lower limit of .8070. The chapter 123 average ratio for the city of Hacken-sack for tax year 2010 was .9916 with an upper limit of 1.1403 and a lower limit of .8429. There was a revaluation for tax year 2011, for which there is no chapter 123 ratio.
Pursuant to N.J.S.A. 54:51A-6b, if the average ratio for the municipality is below the county percentage level (100%) and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level (100%), as is the case here, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. Consequently, the court will determine the assessment for the subject as follows:
Tax Year 2009 52.492,000 x .9429 = $2,349,707
Tax Year 1010 $1493,000 x J9W * ¡52,4711»?
Because 2011 was a revaluation year, the assessment for that year will be reduced to the true value of $2,585,000.
A Judgment establishing the both assessments for the subject property for tax years 2009 will be entered by the Tax Court Clerk as follows:
Bloek204.0M.ctK
land $040,000
Ttnomwrrgnt_$887.800
Total 31,527.800
Block 2<MMMirt2Ml
Land 5809,400
&Bpgrecreeot_$1X500
Total $82.1,900
A Judgment establishing the assessment for the subject property for tax year 2010 will be entered by the Tax Court Clerk as follows:
*408 Bl«* M4.01O.or Iti
Lind ¿673,000
IhaawcaMat $933.700
Total if .606.700
JMoek2Q401/Loi 2Ó.01
land $851,200
kngovsnieat_$13.200
Total $864,400
A Judgment establishing the assessment for the subject property for tax year 2011 will be entered by the Tax Court Clerk as follows:
Block 304.OM.at M
Land $492,800
Improvement_SL1S8.Q00
Total SMSO.SOQ
Lamí $023,400
Hmrovemenf $280.900
Total $904300

 The parties disagree on the frontages of the subject property. Plaintiff contends that the subject property has a frontage of 170 feet along River Street, 118 feet along East Atlantic Street, and 202 feet along Moore Street. Defendant submits the above referenced boundaries. The court finds that these differences do not affect the overall value of the property and uses Defendant’s figures as they provided the frontage along the northerly boundary.

 At that time there was an improvement on the property which was subsequently demolished to make way for the current improvement. At trial, Plaintiff's expert stated that Plaintiff acquired the properly under two deeds totaling $3.8 million, but did not offer any deeds in support of that statement. The deed, dated July 26, 2004, submitted by Defendant concerns both lots and shows that the actual purchase price was $2.3 million.

 Plaintiff instead contends that the lot is 38,577. The court finds that this difference does not affect the overall value of the property and will use Defen *374 dant’s 38,322 square foot figure in the interest of consistency.

 Plaintiffs expert contended that the building contains 4,050 square feet while the Defendant’s expert contended the building contains 4,144 square feet. At trial the parties stipulated that the building on the subject property is 4,100 square feet large.

 Facts or data include “(1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Polzo, supra, 196 N.J. at 583, 960 A.2d 375 (quoting State v. Townsend, 186 N.J. 473, 494, 897 A.2d 316 (2006)).

 At trial, the expert stated that the adjustments were 5% and -5% per annum respectively. As the expert's report states that the adjustments were in the amounts stated above, those are the amounts which the court will use when describing Plaintiff's analysis. To support the adjustment, the expert performed a compared lease analysis which examined lease rents at inception and in subsequent years in addition to data reported by third parties and the expert’s firm’s observations in the course of business.

 Comparable lease 1 is the exception.

 The expert reports the lease date as April 1, 2008. Defendant's expert pointed out at trial that the date listed above is the correct date, as indicated on the cover page of the lease.

 This adjustment was made based on the appraiser’s erroneous belief that the property was constructed in 1999.

 Plaintiff's expert relied upon the 4,050 square foot number when preparing his expert report as the parties did not stipulate to the 4,100 square foot number until the eve of trial.

 Plaintiff and defendant did not stipulate that the building contains 4,100 square feet until after both experts had submitted their expert reports.

 The analysis consists of two leases purporting to demonstrate market growth until mid-2007 and two leases purporting to demonstrate market decline after that time. The leases demonstrating the decline are also Plaintiff's comparable leases 4 and 6, discussed above.

 Parenthetical contained in original citation.

 Given Plaintiff’s evidence surrounding the market decline, Plaintiff has failed to reconcile its conclusion as to true value with the purchase price of the land of $2.3 million only four years prior. Between 2004 and 2008, Defendant constructed a bank branch on the property, and the expert failed to demonstrate how the true value of the property declined by nearly half (by two-thirds using the expert’s purchase price of $3.8 million) even with the construction of the improvement, in only four years.

 The expert made an adjustment to lease 5 because it was newer construction, built in 2007. The court does not agree that a lease requires adjustment for age where the comparable is only two years older than the subject without supporting evidence. Even using Plaintiff's incorrect year of construction for the subject of 1999, the adjustment is unsupported. The court also notes that the expert made a downward adjustment for what he believed to be a difference of eight years, but did not make any corresponding adjustments for any of his comparables which were older than the subject, some by more than thirty years. The only explanation offered by the expert was a vague statement, not based on any facts in the record, that over time, tenants will make upgrades to the leased spaces; that functionally the properties are newer. The expert did not state that he observed the properties or obtain personal knowledge in some other manner that there were upgrades to any of his comparables. Nor did he rely on any market data or information about the specific comparables in coming to that *394 conclusion. Without more, the expert’s explanation cannot be given weight. The inconsistency contained in the expert’s analysis is another reason the court finds Plaintiff’s expert’s analysis, on the whole, to be less credible.

 The other, comparable lease 5, is not entitled to weight for the reasons stated above.

 Though the expert did state that his time adjustments (or lack thereof) were based on sales from 2006 and 2007, the court is not convinced, for substantially the same reasons the court rejected Plaintiff’s time adjustments.

 Defendant’s expert report lists the rent as increasing each year after year three of the ten year term. The average of the listed rents is $42.24 over the first five years of the ten-year term. The lease for this property was entered into evidence. It refers the reader to Schedule A for the rent schedule, but that page was not provided. Instead, the expert testified that he verified the terms of the lease with a party to the transaction. Plaintiff challenged the expert's calculation of face rent, which it argues should be $38.00 per square foot, by directing the court’s attention to Schedule B of the lease. That page indicates that the 2,825 square foot office is leased at $38.00 per square foot for a total of $107,350.00 (2825 x $38.00), on which Plaintiff bases its argument, but that page also includes the 500 square foot drive-through area is leased for $19.00 per square foot for a total of $9,500.00 (500 x $19.00). The expert apparently arrived at his per-square-foot value by adding those two amounts ($107,350.00 + $9,500.00 = $116,850.00) and dividing it by the square footage of the office, which produced the rental amount for the first three years of the term, $41.36. The average rent over the first five years was $42.24.

 The expert stated that national strip centers are more “management intensive" than single freestanding bank branches like the subject. He did not provide any data to support that conclusion.

 According to the expert, RERC Tier 2 properties are "investment properties defined as aging, former first-tier properties, in good to average locations.”

 On direct examination, the expert stated he used replacements costs to determine the value of the improvement, as opposed to reproduction costs. On cross-examination, he stated in this case, replacement cost and reproduction cost would be the same because the improvement is new construction.

 The expert stated, "I did not use — I did not hand calculate each cost item, [and] apply a multiplier. What I did was I relied upon the service that we subscribe to where you enter in all the information which it requests and then come up with a total replacement cost for the building."