TAX COURT OF NEW JERSEY



**VITO L. BIANCO**
JUDGE

77 Headquarters Plaza
1st Floor, North Tower
Morristown, NJ 07960-3964
(609) 815-2922 Ext. 54580
Fax (973) 631-6396

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

**January 23, 2018**

*Via eCourts*

Daniel J. Pollak, Esq.
**Brach Eichler LLC**
101 Eisenhower Parkway
Roseland, New Jersey 07068

Levi J. Kool, Esq.
**O'Donnell McCord, P.C.**
15 Mount Kemble Avenue
Morristown, New Jersey 07960

> **RE:** **416 Route 10 Associates v. East Hanover Township**
> Docket Nos.: 007748-2010; 008742-2011; 008615-2012; 001169-2013; 008219-2014; 007860-2015

This letter opinion constitutes the court's determination after trial of the direct appeals filed by the plaintiff, 416 Route 10 Associates ("Associates"), challenging the 2010, 2011, 2012, 2013, 2014, and 2015 property tax assessments[1] of its property located within the defendant municipality, East Hanover Township ("Township"), commonly known as 416 Route 10, East Hanover, Morris County, and designated by the taxing district as Block 103, Lot 3.01 ("Subject Property").

For the reasons set forth herein, the court reduces the tax assessments of the Subject Property in accordance with the true values established by Associates' for each year at issue.

---

[1] The appeal under Docket No. 005979-2016 was withdrawn on the record at the beginning of trial. A separate judgment has been issued in that matter.

*

The Subject Property is located in the Township's B-2 (Highway Business District) zone,[2] in a densely populated area of Morris County. It contains a single story commercial strip center retail building constructed in 1979, in overall average condition. The building contains 35,497 square feet of improved area, which is partitioned into four units. The retail units contain the following square footage: 5,280, 12,540, 12,384 and 5,293. Each retail unit is heated and cooled by a gas fired HVAC system. The exterior walls are stucco with large glass display window and entry doors along the south (front) side of the building. The building's electric and plumbing services are adequate for its current use. The units were typical in that they had large plate glass windows with an open concept interior design and layout for retail sales with a smaller rear storage/office area. Each unit has one or two restrooms.

There are 123 paved parking spaces located in the front of the subject building. The lot size is approximately 4.0 acres.

For the 2010, 2011, 2012, 2013, 2014, and 2015 tax years, the Subject Property was assessed as follows:

| | |
|---|---|
| Land | $2,000,000 |
| Improvements | $3,733,800 |
| TOTAL | $5,733,800 |

Both parties offered the testimony of a professional real estate appraiser who were accepted by the court as experts without objection; each expert prepared an appraisal report that was admitted in evidence, also without objection. Both experts concluded that based upon demand and physical attributes of the site, the Highest and Best use of the Subject Property, as vacant, is for

---

[2] Permitted uses include one-family dwellings; stores; shops and markets; business and professional offices; banks and financial institutions; parking lots; restaurants; mortuary or funeral homes; theaters; bowling alleys and other similar recreational facilities; automobile sales and showrooms; business uses serving highway traffic; warehouse facilities; the finishing or assembly of articles made from previously or prepared or refined materials; the preparation and fabrication of metals and metal products, chemicals and chemical products; research activities and hotels or motels.

retail use in accordance with the zone. Since the present improvements contribute significantly to the overall value of the property, are maximally productive and are consistent with the highest and best use as vacant, both experts also concluded that the highest and best use as improved is a continuation of the present use as a retail property.

There were no other witnesses.

According to Associates' expert, the Subject Property's true value on the relevant valuation dates was:

| Amount | Tax Year | Valuation Date |
|--------|----------|----------------|
| $5,750,000 | 2010 | October 1, 2009 |
| $6,030,000 | 2011 | October 1, 2010 |
| $6,220,000 | 2012 | October 1, 2011 |
| $6,310,000 | 2013 | October 1, 2012 |
| $6,400,000 | 2014 | October 1, 2013 |
| $6,490,000 | 2015 | October 1, 2014 |

Each of these conclusions of value, if accepted by the court, would result in a lower assessment of the Subject Property for each tax year at issue, as the *true value to assessment ratios* for all tax years exceed the upper limits of the common range.

While the sales comparison and cost approach to value[3] were considered, the Associates' expert relied upon the income capitalization approach. The Associates' expert identified ten comparable leases he concluded were comparable to the Subject Property. No adjustments were made to reflect differences between the proposed comparables and the Subject Property.[4]

---

[3] The expert concluded that the reliability and soundness of the Sales Comparison Approach is limited within the commercial retail market, as property values can be significantly influenced by their specific income streams and vacancy rates. Within the market, it is challenging to determine exact vacancy rates and whether the leased fee interest was the determining factor in overall price. Therefore, the Sales Comparison Approach is considered a less reliable value indicator. The Cost Approach was not utilized due to the age of the building and difficulties in estimating accrued depreciation.

[4] At the close of Associates' proof, motions made by the Township to dismiss the matters pursuant to R. 4:37-2(b), and to bar Associates' expert report, were denied by the court.

The Township's expert utilized the sales comparison approach and the income approach to determine the fee simple market value of the subject property as of each dates in question. The cost approach was considered, however, due to the age of the subject buildings, this approach was not employed. Further, market participants would not consider this approach in valuing the subject property.

A search of the immediate market area revealed that there are few comparable buildings of this size and age available for sale as of the valuation dates. The Township's expert searched for comparables deemed to be most similar to the Subject Property as of the dates in question. All of the comparables were of retail facilities. Adjustments were considered for time, size, age/condition/appeal, economic characteristics and location.

In his sales comparison approach, the Township's expert arrived at the following values:

| Amount | Tax Year | Valuation Date |
|---|---|---|
| $10,470,000 | 2010 | October 1, 2009 |
| $ 9,760,000 | 2011 | October 1, 2010 |
| $ 9,760,000 | 2012 | October 1, 2011 |
| $ 9,400,000 | 2013 | October 1, 2012 |
| $ 9,400,000 | 2014 | October 1, 2013 |
| $ 9,230,000 | 2015 | October 1, 2014 |

In his income approach, the Township's expert arrived at the following values:

| Amount | Tax Year | Valuation Date |
|---|---|---|
| $ 8,800,000 | 2010 | October 1, 2009 |
| $ 9,335,000 | 2011 | October 1, 2010 |
| $10,115,000 | 2012 | October 1, 2011 |
| $10,940,000 | 2013 | October 1, 2012 |
| $10,940,000 | 2014 | October 1, 2013 |
| $10,940,000 | 2015 | October 1, 2014 |

The Township's expert concluded that market value of the Subject Property as of the dates in question, was as follows:

4

| Amount | Tax Year | Valuation Date |
|--------|----------|----------------|
| $ 9,500,000 | 2010 | October 1, 2009 |
| $ 9,600,000 | 2011 | October 1, 2010 |
| $ 9,850,000 | 2012 | October 1, 2011 |
| $10,000,000 | 2013 | October 1, 2012 |
| $10,000,000 | 2014 | October 1, 2013 |
| $10,000,000 | 2015 | October 1, 2014 |

If accepted by the court, the conclusions of value of the Township's expert fall within the Chapter 123 ratio for tax years 2010, 2011, and 2012, and therefore support the original assessment of the Subject property for each those years. However, the expert's conclusions of value for tax years 2013, 2014, and 2015, fall below the lower limit of the common range, and would therefore support an increase of the tax assessment of the Subject Property for each of those tax years.[5]

## Value

### (1) Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). The presumption attaches to the quantum of the tax assessment. Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous. Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). The presumption is not simply an evidentiary presumption serving only as a mechanism to allocate the burden of proof. It is, rather, a construct that expresses the view that in tax matters, it is to be presumed that governmental authority has been exercised correctly and in accordance with law. MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 374 (citing Pantasote Co., supra, 100 N.J. at 413). The presumption of correctness

---

[5] For tax years 2013, 2014, and 2015, the *true value to assessment ratio* is 57.33 %, which falls *below* the lower limit of the common range of 61.38 % for 2013, 60.82 % for 2014, and 60.06 % for 2015.

stands, until sufficient competent evidence to the contrary is adduced. Little Egg Harbor Township v. Bonsangue, 316 N.J. Super 271, 285-86 (App. Div. 1998).

A taxpayer can only rebut the presumption by introducing cogent evidence of true value. The evidence must be definite, positive and certain in quality and quantity to overcome the presumption, Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952), and "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" W. Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000), certif. denied, 165 N.J. 488 (2000)).

Therefore, at the close of plaintiff's proofs, the court must be presented with evidence which raises a debatable question as to the validity of the assessment. MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 376.

The court finds that the proofs submitted by Associates meets the standard to overcome the presumption of the validity of the various assessments at issue in the present matters. The proofs submitted by the Township, however, fail to meet that standard.

### (2) **Approach to Value**

The court is satisfied that the income approach is the best indicator of value in the present matters. "When the property is income-producing, the preferred method for determining the estimated market value of that property is the income capitalization approach [citations omitted]." VBV Reality v. Scotch Plains Tp., 29 N.J. Tax 548, 559 (Tax 2017).

### (3) **Expert Opinions**

Our law is well settled with regard to the required bases for opinions offered by experts

regarding adjustments to proposed comparable sales/leases, and opinions of in value for tax

purposes:

> [I]n the realm of tax appeals . . . an expert's reliance on subjective measures for calculation and application of adjustments is unacceptable. Greenblatt v. Township of Englewood, 26 N.J. Tax 41, 55 (Tax 2011) ("adjustments must have a foundation obtained from the market" with an "explanation of the methodology and assumptions used in arriving at the[ ] adjustments[ ]" otherwise they are entitled to little weight.). In Dworman, supra, 1 N.J. Tax at 458 (citations [**16] omitted), this court established that "[t]he opinion of an expert depends upon the facts **[*383]** and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Thus an expert's opinion is only as good as the data upon which the expert relied. See Congoleum Corp. v. Township of Hamilton, 7 N.J. Tax 436, 451 (Tax 1985) (Adjustments must be adequately supported by objective data.); Kearny Leasing Corp. v. Township of Kearny, 6 N.J. Tax 363, 376 (Tax 1984), aff'd o.b., 7 N.J. Tax 665 (App.Div.1985), certif. denied, 102 N.J. 340, 508 A.2d 215 (1985). "An expert's conclusion rises no higher than the data which provide the foundation." City of West Orange v. Goldman, 2 N.J. Tax 582, 588 (Tax 1981) (citations omitted). "Expert opinion unsupported by adequate facts has consistently been rejected by the Tax Court." Hull, supra, 16 N.J. Tax at 98 (citing Willow/Leonia Assocs. v. Borough of Leonia, 12 N.J. Tax 338, 344 (1992)).
>
> Still, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Township of Wall, 99 N.J. 265, 280, 491 A.2d 1247 (1985) (citing New Cumberland Corp. v. Borough of Roselle, 3 N.J. Tax 345, 353 (Tax 1981)). However, to enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record . . . The court's independent determination of value must be based "on the evidence before [**17] it and the data that are properly at its disposal." F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430, 495 A.2d 1313 (1985).
>
> **[TD Bank v. City of Hackensack, 28 N.J. Tax 363, 382-83 (Tax 2015)]**

### a. **The Township's Expert**

The Township's expert relied substantially on internet sites to verify terms and conditions of the proffered comparable sales and leases. Here, as in TD Bank, "[t]he facts and data about the comparable sale transactions, . . ., were not verified, confirmed, or corroborated with any individuals possessing firsthand knowledge of, or familiarity with those sale transactions." Id. at 562. The same is true for the comparable leases utilized here by the Township's expert.[6] "The first, and perhaps the most important, step in the income approach is the gathering of lease data. This involves the *actual* reading of all leases or lease extracts." Robert L. Garrett ET AL., *The Valuation of Shopping Centers*, 20 (1976), emphasis added. This was not done here.

> Referencing public records and data services does not verify a sales transaction. It simply confirms that a transaction was recorded. Similarly, referencing the source of secondary data only confirms its existence and does not verify the transaction. Generally, secondary sources do not provide adequate information . . . This underscores the importance of personal verification with persons knowledgeable about the details of the transaction.
>
> [Appraisal Institute, *The Appraisal of Real Estate*, 385 (14 ed. 2013).]

Accordingly the opinions and conclusions of the Township's expert based upon the

---

[6] In recognizing the pitfalls which exist with information reported on public websites and real estate multiple listing service websites, the Appraisal Institute cautions appraisers that while "the service will contain fairly complete information about these properties, including descriptions and brokers' names. . . details about a property's square footage, basement area, or exact age may be inaccurate or excluded." *The Appraisal of Real Estate, supra*, at 119. In fact, most local residential and commercial real estate listing service websites contain express disclosures about the accuracy of the data and information contained therein. . . . The rationale behind this disclosure is practical, as the information contained on the website may be reported to real estate sales professionals by unsophisticated third parties and thus, based upon erroneous data or speculation.

[VBV Realty, LLC v. Scotch Plains Tp., 29 N.J. Tax 548, 563 (2017)]

unverified terms of sale and lease transactions, are entitled to little weight.

### b. Associate's Expert

Unlike the Township's expert, Associates' expert did not rely on internet sites but rather, he independently verified terms and conditions of the proffered comparable leases he utilized. Associates' expert testified, however, that he did not make any numerical adjustments for time or other conditions to those proffered comparables. He explained that it's best to keep adjustments to a minimum and be able to articulate your rational for the adjustments. He stated that a number adjustment is a statistic suggesting a statistical analysis, which is almost impossible to do when there are many factors effecting the agreement between the lessor and the lessee.

Furthermore, in his experience, numerical adjustments only lead to rigorous cross-examination. The cross-examination tends to follow a pattern of "why 10%, and not 5%," leading to a series of questions of "why and what fors." Associates' expert contends that articulating the differences in the comparables (e.g. the location proximity and the similarity of physical size) is more important than the numerical adjustment itself. Accordingly, he concludes that data as it falls is enough to reconcile the value of the comparable; here, for example, the sizes of each comparable were very close, and when the size was not similar, the recognition of this fact is more important than the numerical variance. Accordingly, the data is best left alone as it is the best comparable measurement.

Associates' expert *quantified* his articulation of the differences in the comparables by pointing out that the Tax Court is a unique venue, since the Judges have a specific expertise in the field. The Tax Court Judges can understand what expert witnesses are talking about and can make final determinations based on the credibility of the expert. Accordingly, Associates' expert suggests that hypothetical adjustments are unnecessary in Tax Court, as Judges are familiar enough

in the subject matter, and therefore simple articulation of the differences in the comparable is sufficient, and the best means of finding value in the comparable.

It is true that Tax Court Judges are deemed to have specific expertise in the field of taxation, N.J.S.A. 2B: 13-6(b)[7], however, that fact alone does not justify disregarding and usurping opinion testimony of experts, or filling in gaps in experts' testimony, without a factual basis in the record for such action. "The court's independent determination of value must be based 'on the evidence before [**17] it and the data that are properly at its disposal.'" TD Bank v. City of Hackensack, supra, 28 N.J. Tax 383, citing, F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430, 495 A.2d 1313 (1985).

Expert "[a]ppraisers can usually find some logic to support most quantitative adjustments given the number of tools available to them." Appraisal Institute, *The Appraisal of Real Estate*, 398 (14 ed. 2013). While Associates' expert seems to suggest that some adjustments may be appropriate for some of his proposed comparable leases, he leaves it for the court to decide what those adjustments, if any, should be. Associates' expert proffers that the court can draw its own conclusions on matters for which he has chosen to render no opinion, simply because Tax Court Judges speak and understand his appraisal language. To such a proffer, the court is left to ponder, what then is the necessity of having expert testimony at all? The court is not persuaded by such reasoning.

That notwithstanding, this court is not wholly unsympathetic to the argument raised here by Associates' expert. There has been some criticism of late, that the Tax Court perhaps has raised the bar for meeting the standard of proof *too high* in property tax appeals, given *arguendo*, what could be viewed as a growing trend seen in a number of recent decisions, where the court rejected

---

[7] "[T]he special expertise of the Tax Court enables its judges to evaluate the evidence and adjudicate the issues presented." Mori v. Secaucus Town, 17 N.J. Tax 96, 98 (Tax 1997).

expert opinions and declined to come to value.[8]  While such a suggestion may give the Tax Court pause for self-examination and reflection,[9] it must not serve to invite expert appraisers to abrogate their responsibility of providing the court with "an explanation of the methodology and assumptions used in arriving [or, as here, *not* arriving] at the . . . adjustments[.]" Greenblatt v. Township of Englewood, 26 N.J. Tax 41, 55 (Tax 2011).

Accordingly, this court will interpret the conscious decision of Associates' expert *not* to make any adjustments to his proffered comparable leases in the present matters, as his conclusion that the differences he delineated by his testimony between the comparables and the Subject Property are sufficiently insignificant so as not to effect value.

In that regard, the most salient differences between the proposed comparables of Associates' expert and the Subject Property concern time, location, land size, and building size.

Since Associates' expert, for the most part, used time appropriate leases with corresponding tax years and not with other years, adjustments for time do not appear to be necessary.  The court finds that the testimony and data of Associates' expert are generally supportive of his conclusions.

All of the proposed comparables of Associates' expert are located along the Route 10 and Mt. Pleasant Avenue corridor in East Hanover, Hanover, and Livingston Townships in Morris and Essex Counties. The court finds all these locations are similar to the Subject Property and therefore, no location adjustment is warranted.

---

[8] *Real Estate Tax Appeals Update 2018*, CLE Seminar, January 13, 2018.
[9] See City of Atlantic City v. Ace Gaming, 23 N.J. Tax 70, 85 (Tax 2006), citing City of Atlantic City v. Ginnetti, 17 N.J. Tax 354, 361 (Tax 1998), citing Ford Motor Co. v. Edison Tp., 127 N.J. 290, 310-14 (1992) ("the Tax Court was 'admonished by the Supreme Court to find value.'")

Land sizes of the comparables (except Improved Lease No. 7 where the land size is not clear) varies from about 1.43 acres to about 8.044 acres, compared with the 4.0 acre Subject Property. The building square footage of the comparables varies from 7,780 square feet to 50,685[10] square feet (except Improved Lease No. 8 where the building square footage is not clear), compared with the 35,497 building square feet of the Subject Property. It does not appear to the court that the differences between the land and building size of the Subject Property compared to those of the proposed comparables have any significant impact on the conclusions of value of Associates' expert. Furthermore, if Improved Leases No. 7 and No. 8 are rejected because of their ambiguities, the court finds that the value conclusions of Associates' expert would not be altered. The court is satisfied that nothing in the testimony or report of Associates' expert raises cause for concern with regard to the independently verified terms and conditions of the proffered comparable leases he utilized.

For all tax years at issue, Associates' expert projected a stabilized vacancy and collection loss rate of 15% as appropriate for the subject property; 3% for management, which is in line with market levels for such properties and includes an allowance for expenses; a stabilized allowance for leasing commissions of 3.75%; a 50% renewal rate, assuming a $1.50 per square foot average; and, based upon the age, condition and configuration of the subject improvements, structural reserves at $0.30 per square foot of gross building area. The court finds these conclusions, reasonable and supported by the testimony and data provided by Associates' expert. The same holds true for his income analysis derived from evaluating the rent rolls for the Subject Property, as well as his conclusions for net operating income, and market rent per square foot.[11]

---

[10] In some instances, only a portion or portions of the total building was(were) occupied.
[11] Associates' expert concluded $20 per square foot market rent for all tax years from a range of roughly $14 to $23 per square foot derived from his proposed comparable leases.

In his calculation of income capitalization, Associates' expert selected mortgage interest rates and equity dividend rates which the court finds to be reasonable and supported by his testimony and data.

## Conclusion

In sum, the conscious decision of the Associates' expert *not* to make adjustments, and *not* his refusal or failure to make adjustments, does not serve as a hindrance to the court's ability to find value in these matters. The court is satisfied that Associates' expert provided "an explanation of the methodology and assumptions used" Greenblatt, supra, 26 N.J. Tax at 55, sufficient to support a conclusion that no adjustments to his proposed comparable leases are necessary here. Furthermore, the court finds that calculations and conclusions of Associates' expert under the income approach to value are generally reasonable and supported by his testimony and data. Conversely, the court rejects the opinions and conclusions of the Township's expert since they are based upon the unverified terms of sale and lease transactions.

Accordingly, the court finds that the true values of the Subject Property on each relevant assessment date are as follows:

| Amount | Tax Year | Valuation Date |
|---|---|---|
| $5,750,000 | 2010 | October 1, 2009 |
| $6,030,000 | 2011 | October 1, 2010 |
| $6,220,000 | 2012 | October 1, 2011 |
| $6,310,000 | 2013 | October 1, 2012 |
| $6,400,000 | 2014 | October 1, 2013 |
| $6,490,000 | 2015 | October 1, 2014 |

The assessment for each of the tax years at issue shall be revised as follows:

Tax year 2010:

The assessment ($5,733,800) to true value ratio ($5,750,000) exceeds the upper limit of the common range (i.e. 70.39%). Accordingly the revised 2010 assessment shall be as

13

follows: $5,750,000 (true value) x 61.21% (average ratio) = $3,519,575, say $3,519,600, and allocated as

| | |
|---|---|
| Land | $2,000,000 |
| Improvements | $1,519,600 |
| TOTAL | $3,519,600 |

Tax year 2011:

The assessment ($5,733,800) to true value ratio ($6,030,000) exceeds the upper limit of the common range (i.e. 74.27%). Accordingly the revised 2011 assessment shall be as follows: $6,030,000 (true value) x 64.58% (average ratio) = $3,894,174 say $3,894,200, and allocated as

| | |
|---|---|
| Land | $2,000,000 |
| Improvements | $1,894,200 |
| TOTAL | $3,894,200 |

Tax year 2012:

The assessment ($5,733,800) to true value ratio ($6,220,000) exceeds the upper limit of the common range (i.e. 76.98%). Accordingly the revised 2012 assessment shall be as follows: $6,220,000 (true value) x 66.94% (average ratio) = $4,163,668 say $4,163,700, and allocated as

| | |
|---|---|
| Land | $2,000,000 |
| Improvements | $2,163,700 |
| TOTAL | $4,163,700 |

Tax year 2013:

The assessment ($5,733,800) to true value ratio ($6,310,000) exceeds the upper limit of the common range (i.e. 83.04%). Accordingly the revised 2013 assessment shall be as follows: $6,310,000 (true value) x 72.21% (average ratio) = $4,556,451 say $4,556,500, and allocated as

|            |             |
|------------|-------------|
| Land       | $2,000,000  |
| Improvements | $2,556,500 |
| TOTAL      | $4,556,500  |

Tax year 2014:

The assessment ($5,733,800) to true value ratio ($6,400,000) exceeds the upper limit of the common range (i.e. 82.28%). Accordingly the revised 2014 assessment shall be as follows: $6,400,000 (true value) x 71.55% (average ratio) = $4,579,200, and allocated as

|            |             |
|------------|-------------|
| Land       | $2,000,000  |
| Improvements | $2,579,200 |
| TOTAL      | $4,579,200  |

Tax year 2015:

The assessment ($5,733,800) to true value ratio ($6,490,000) exceeds the upper limit of the common range (i.e. 81.26%). Accordingly the revised 2015 assessment shall be as follows: $6,490,000 (true value) x 70.66% (average ratio) = $4,585,834 say $4,585,800, and allocated as

|            |             |
|------------|-------------|
| Land       | $2,000,000  |
| Improvements | $2,585,800 |
| TOTAL      | $4,585,800  |

The Tax Court shall issue judgments consistent with this letter opinion.

Very truly yours,


/s/Hon. Vito L. Bianco, J.T.C.

VLB:JB:MK:tms